719 F.2d 207
 1983-2 Trade Cases 65,617, 14 Fed. R. Evid. Serv. 240
 Chester A. WILK, D.C.; James W. Bryden, D.C.; Patricia A.
Arthur, D.C.; Steven G. Lumsden, D.C.; and
Michael D. Pedigo, D.C., Plaintiffs-Appellants,
v.
AMERICAN MEDICAL ASSOCIATION, American Hospital Association,
American College of Surgeons, American College of
Physicians, Joint Commission on Accreditation of Hospitals,
American College of Radiology, American Academy of
Orthopaedic Surgeons, Illinois State Medical Society, H.
Doyl Taylor, Joseph A. Sabatier, M.D., H. Thomas Ballantine,
M.D., James H. Sammons, M.D., Defendants-Appellees.
 No. 81-1331.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 20, 1982.
Decided Sept. 19, 1983.
As Amended Oct. 3, 1983.
Rehearing and Rehearing En Banc Denied Dec. 1, 1983.
 
 1
 George P. McAndrews, Allegretti, Newitt, Witcoff & McAndrews, Chicago, Ill., for plaintiffs-appellants.
 
 
 2
 Phil C. Neal, Friedman & Koven, Max E. Wildman, Chicago, Ill., for defendants-appellees.
 
 
 3
 Dennis C. Waldon, W. Thomas Huyck, Roan & Grossman, Jay H. Hedgepeth, Chicago, Ill., for, American Hospital Association.
 
 
 4
 Before SWYGERT, Senior Circuit Judge, SPRECHER,* Circuit Judge, and DOYLE, Senior District Judge.**
 
 
 5
 JAMES E. DOYLE, Senior District Judge.
 
 
 6
 Plaintiffs appeal from a judgment entered on a jury verdict in favor of defendants-appellees. Plaintiffs, five licensed chiropractors, charged defendants-appellees[1] with violating sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1 and 2 (1979).[2] Plaintiffs alleged that defendants engaged in a combination and conspiracy to eliminate the chiropractic profession through refusing to deal with plaintiffs and other chiropractors. Plaintiffs alleged defendants implemented the group boycott by agreeing to induce individual medical doctors to forego any form of professional, research, or educational association with chiropractors, to induce hospital and other health care facilities to deny access to chiropractors, and to induce actual and prospective patients of chiropractors to avoid seeking chiropractic services. Plaintiffs also alleged that through this agreement, defendants attempted to monopolize and conspired to monopolize certain health care markets.[3]
 
 I. GROUNDS OF APPEAL
 
 7
 Plaintiffs' principal ground of appeal is that the court's instructions gave the jury to understand, incorrectly, that a boycott by defendants, resulting in a diminution of competition between chiropractors and medical doctors, was lawful if the boycott was the product of a genuine belief by medical doctors that chiropractic is dangerous quackery. Because the district court embraced this incorrect view of the law, plaintiffs contend, it received in evidence, erroneously and over objection, much prejudicial material concerning the alleged evils of chiropractic. Plaintiffs contend also that the jury was incorrectly instructed on the application of the first amendment in the circumstances.
 
 
 8
 The remaining grounds of appeal relate to: jury instructions on coercive enforcement of ethical canons as an essential element of a conspiracy of the type alleged; jury instructions relating to apparent authority of agents; the trial court's handling of the "unclean hands" concept; and the trial court's refusal to permit reopened discovery into settlement negotiations.
 
 
 9
 Defendants-appellees dispute all of these contentions, of course. Five of the organization defendants (JCAH, AHA, ACP, ACS, and ISMS) raise a further argument. Each claims that its motion for a directed verdict was erroneously denied by the district court. Each asserts that the evidence was insufficient to support a jury finding that it was a member of a conspiracy. Thus, each contends, the judgment they won should be affirmed even if the judgment in favor of the other defendants were to be reversed on one ground or another.
 
 
 10
 In the following section headed "Facts," we set forth those propositions which a reasonable jury might have found as fact and which might arguably have prompted a verdict in plaintiffs' favor, had the jury been instructed as plaintiffs contend it should have been and had the jury been protected from the allegedly prejudicial evidence. We set forth, also, those facts concerning the involvement of JCAH, AHA, ACP, ACS, and ISMS in the alleged conspiracy which a reasonable jury might have found from the evidence, viewed most favorably to the plaintiffs.
 
 II. FACTS
 
 11
 The American Medical Association (AMA) is a nonprofit corporation with a membership of over 200,000 medical doctors, which is nearly half the total number of medical doctors in the United States. AMA is a federation of independent state and territorial medical societies, each of which appoints representatives to the House of Delegates of the national organization. The House of Delegates elects the AMA Board of Trustees. AMA is heavily involved in this country's professional and public medical education programs. AMA also publishes numerous professional journals, receives and responds to questions from the public on medical subjects, and engages in legislative lobbying. AMA promulgates the Principles of Medical Ethics, which are interpreted by its Judicial Council.
 
 
 12
 The American Hospital Association (AHA) is a nonprofit corporation composed of 7,000 organization members and 30,000 individual members. Approximately 6,000 of the 7,000 hospitals in the United States belong to AHA. AHA publishes several periodicals and manuals on various topics related to hospital operations. It also collects statistics on hospitals, sponsors educational programs, and reviews and responds to governmental activities relevant to hospital operations.
 
 
 13
 The American College of Surgeons (ACS) is a nonprofit corporation having as its members about 40,000 of the 100,000 American physicians who identify themselves as surgeons. ACS takes public positions on relevant issues and sometimes expresses those positions to legislative and administrative bodies.
 
 
 14
 The American College of Physicians (ACP) is a nonprofit corporation composed mainly of physicians who specialize in internal medicine. Its chief function is to conduct continuing education programs for members and nonmembers.
 
 
 15
 The Joint Committee on Accreditation of Hospitals (JCAH) is a nonprofit corporation having AMA, AHA, ACS, ACP, and the American Dental Association as its members. The member organizations appoint representatives to the JCAH Board of Commissioners, the policy-making body of JCAH. JCAH operates a health care facilities accreditation program, in which it establishes standards for accreditation and conducts surveys of individual institutions when they so request. If a facility meets JCAH standards, that facility is accredited.
 
 
 16
 The American College of Radiology (ACR) is a nonprofit corporation with approximately 13,000 members, most of whom are medical doctors specializing in radiology. It is active in education and research, and it furnishes advice and information to government, private industry, and health care professionals concerning radiation protection and the practice of radiology.
 
 
 17
 The American Academy of Orthopaedic Surgeons (AAOS) is a nonprofit corporation composed of about 9,000 medical doctors who specialize in orthopaedic surgery. More than 75 percent of the total number of board-certified orthopaedic surgeons in the United States belong to AAOS. AAOS conducts continuing medical education courses for practicing orthopaedic surgeons and persons working in related areas, including orthopaedic nursing, occupational therapy, physical therapy, and manufacturing braces and artificial limbs.
 
 
 18
 The Illinois State Medical Society (ISMS) is a state medical society with approximately 14,000 medical doctors as members. ISMS is one of the fifty state medical societies that comprise AMA.
 
 
 19
 Doyl Taylor was employed by AMA and served as director of the AMA Department of Investigation and as secretary to the AMA Committee on Quackery. Joseph A. Sabatier, Jr., M.D., and H. Thomas Ballantine, Jr., M.D., both served on the AMA Committee on Quackery as members and chairmen. James H. Sammons, M.D., was a member of the AMA Board of Trustees.
 
 
 20
 Chiropractic is a health care service. Its primary therapeutic tool is spinal manipulation.[4] Chiropractors and medical doctors treat some of the same medical problems. Chiropractors would treat some patients in health care facilities and would use hospital X-ray and laboratory services if such treatment and use were permitted.
 
 
 21
 In Illinois, Michigan, California, Colorado, and Missouri, five states where plaintiffs have practiced, there were no laws in effect during the time relevant to this lawsuit that prohibited chiropractors from furnishing care in a hospital under the supervision of a medical staff member, nor were there laws preventing hospitals from providing X-ray or laboratory services to chiropractors or preventing hospital X-ray departments or radiologists from making X-ray films or copies of X-rays available to chiropractors at the request of their patients.
 
 
 22
 Principle 3 of the AMA Principles of Medical Ethics in effect during the alleged boycott provided: "A physician should practice a method of healing founded on a scientific basis; and he should not voluntarily professionally associate with anyone who violates this principle."
 
 
 23
 At its meeting on November 2 and 3, 1963, the AMA Board of Trustees voted to establish a "Committee on Quackery" (Committee). The Committee was active from that time until 1974. It considered "its prime mission to be, first, the containment of chiropractic and ultimately, the elimination of chiropractic." Memorandum to AMA Board of Trustees from Committee on Quackery, January 4, 1971. During these years, the AMA also operated a Department of Investigation (Department), a clearing-house for information on healing methods AMA deemed unscientific.
 
 
 24
 In December of 1966, upon the recommendation of the Committee and the AMA Board of Trustees, the AMA House of Delegates adopted a resolution asserting: "It is the position of the medical profession that chiropractic is an unscientific cult whose practitioners lack the necessary training and background to diagnose and treat human disease." This resolution, together with Section 3 of the Principles of Medical Ethics, was incorporated into the Opinions and Reports of the Judicial Council.
 
 
 25
 The Committee characterized this policy statement as follows:
 
 
 26
 This was the necessary tool with which your Committee has been able to widen the base of its chiropractic campaign. With it, other health-related groups were asked and did adopt the AMA policy statement or individually-phrased versions of it. These, in turn led to even wider acceptance of the AMA position.
 
 
 27
 ....
 
 
 28
 The hoped-for effect of this widened base of support was and is to minimize the chiropractic argument that the campaign is simply one of economics, dictated and manipulated by the AMA.
 
 Memorandum, supra, at 2.[5]
 
 29
 The Committee and the Department prepared numerous publications critical of chiropractic for distribution to medical professionals and laypersons. The Committee was extensively involved in legislative work at state and national levels on such matters as chiropractic licensing and Medicaid and Medicare reimbursement for chiropractic services. Among its other activities were sending letters warning medical boards and associations that professional cooperation and association between chiropractors and physicians were unethical and attempting to discourage colleges, universities, and faculty members from cooperating with chiropractic schools.
 
 
 30
 Codefendant organizations AHA, ACS, ACP, JCAH, ACR, AAOS, and ISMS communicated in various ways with defendant AMA and its Committee on Quackery. Some codefendant staff members attended meetings and a conference of chiropractic sponsored by the Committee. Codefendant staff members also discussed with Committee members ways of responding to inquiries from individual physicians and hospitals concerning possible professional cooperation with chiropractors. Representatives of three codefendant associations joined with AMA to form defendant JCAH and to determine requirements for JCAH accreditation. The JCAH accreditation manual asserted that a hospital permitting chiropractors to use its facilities would "very probably" lose its accreditation. Some codefendant organizations adopted the AMA Principles of Medical Ethics, including Principle 3.
 
 
 31
 Through such mechanisms, individual physicians were discouraged from cooperating with chiropractors in: patient treatment, because referrals were inhibited by defendants' activities; research; and educational activities, such as sharing clinical experience and research results. Chiropractors were denied access to the hospital facilities they considered necessary to practice their professions. Medical doctors were discouraged from aiding chiropractors in interpreting electrocardiograms. Requests by individual plaintiffs to use laboratory and X-ray facilities were not granted; requests for hospital in-patient privileges were similarly denied. Referrals from medical doctors were reduced. Public demand for chiropractic services was negatively affected.
 
 
 32
 JCAH. JCAH was comprised of twenty-one members, seven appointed by AMA, seven by AHA, three by ACS, three by ACP, and one by the American Dental Association. JCAH exercised considerable power over hospitals through the mechanism of accreditation. JCAH staff members replied to letters from hospitals on chiropractors by asserting that a hospital permitting chiropractors to use its services, such as laboratory testing and X-rays, would endanger its status as an accredited institution, even if a state passed a law requiring hospitals to allow chiropractors to be staff members. These letters at times referred to the AMA Principles of Medical Ethics and to an AMA publication on chiropractic. JCAH jointly published with AHA a widely distributed manual, Hospital Accreditation References, setting forth standards and criteria for JCAH accreditation. The manual was written by the director of JCAH. The manual contained the following statements: "The Commission looks on chiropractors as cultists. A hospital that encourages cultists to use its facilities in any way would very probably be severely criticized and lose its accreditation." The same statements appeared in a column written by the JCAH director, published in the Journal of the American Hospital Association. In its Accreditation Manual for Hospitals, JCAH incorporated the AMA Principles of Medical Ethics, and asserted: "Failure by the medical staff and the governing body to take all reasonable steps to ensure adherence to these ethical principles shall constitute grounds for nonaccreditation." In denying plaintiff Lumsden staff privileges, one hospital cited its unwillingness to jeopardize its JCAH accreditation.
 
 
 33
 AHA. AHA appointed commissioners to JCAH. AHA and JCAH collaborated to publish Hospital Accreditation References. AHA also published that material in the AHA professional journal. Dr. Shu, an AHA employee who responded on behalf of AHA to inquiries from individual hospitals concerning use of facilities by chiropractors, answered those inquiries by citing the JCAH view that accreditation would be jeopardized if such use were permitted. At the AMA "National Conference on Health Quackery--Chiropractic," Dr. Shu attended a presentation of the "right and duty" of hospitals to exclude chiropractors. He also met informally with AMA and JCAH employees to discuss ways of answering questions from hospitals concerning chiropractors. Persons attending this meeting discussed the ethical prohibition on physicians' association with chiropractors. Dr. Shu had telephone conversations with AMA and JCAH personnel on the subject of chiropractors using hospital facilities.
 
 
 34
 ACP. ACP appointed commissioners to JCAH. Minutes from an ACP board of governors meeting in 1978 described activities of the ACP's "Ad Hoc Committee on Chiropractic."[6] The committee was named "to suggest what might be done at the Chapter or regional level to promote the College's policy toward chiropractic." Although part of the committee's purpose was simply to inform ACP members of pending lawsuits by chiropractors against ACP, the committee also recommended that:
 
 
 35
 the Governors should remain alert to efforts of chiropractors to gain access to radiographic and clinical laboratory diagnostic facilities in their regions and keep ACP headquarters informed of such developments;
 
 
 36
 the Governors should alert colleagues in other disciplines to the efforts of chiropractors to gain access to radiographic and clinical pathology diagnostic facilities; and
 
 
 37
 the Governors and the College members in their regions should discuss these matters with their county and state medical societies and with their representatives to the House of Delegates of the AMA.
 
 
 38
 The ACP board of governors unanimously voted to approve the committee's report and to distribute it immediately.
 
 
 39
 ACS. ACS appointed three commissioners to JCAH. The ACS "Statement on principles" endorsed the Principles of Medical Ethics and suggested that infraction of those principles would result in disciplinary action by ACS. An ACS director attended the National Conference on Health Quackery sponsored by the AMA Committee on Quackery. A former ACS director responded to a request from a state medical society for the ACS position on the relationship between physicians and chiropractors by asserting: "The College has never taken an official position in regard to relationships between M.D.s and chiropractors. We have followed the lead of the AMA, which is not always entirely clear." The letter notes that this director called the AMA legal department for an answer to the inquiry, and the letter suggests the AMA be consulted for an "authoritative" opinion.
 
 
 40
 ISMS. ISMS adopted the Principles of Medical Ethics, and ISMS members are bound by the principles. ISMS appointed its own Committee on Quackery. AMA Committee on Quackery staff member Doyl Taylor spoke to the ISMS committee on AMA activities and formal positions concerning chiropractic. ISMS committee members attended an AMA-sponsored meeting on quackery at which chiropractic was a major item of discussion. The ISMS committee endorsed the AMA House of Delegates statement labeling chiropractic an "unscientific cult." The ISMS Board of Trustees subsequently adopted this statement. The ISMS Board of Trustees had jurisdiction over all ethical questions. Doyl Taylor wrote the chair of the ISMS Committee on Quackery to suggest various meetings, referring to ISMS as "an active partner in the fight to head off chiropractic." The "Policy Manual of the Illinois State Medical Society," May, 1967, included the following statement: "The Judicial Council of the American Medical Association has ruled that it is unethical to associate VOLUNTARILY with an individual who practices as a member of a 'cult.' " (emphasis in original) In 1975, the AMA named Dr. Lees, former chairman of the ISMS Board of Trustees, to the AMA Committee on Quackery. A letter written by an ISMS staff member in 1966, complained to Doyl Taylor about the AMA position on chiropractic, but took no action to dissociate itself from that position.III. OPINION
 
 
 41
 Plaintiffs alleged and undertook to prove that each of the defendants-appellees had done certain things at certain times, with the result that chiropractors' ability to compete with medical doctors for patient fees had been impaired. In their affirmative case, plaintiffs presented themselves and chiropractors generally as serious, unpretentious, governmentally-licensed practitioners in competition with medical doctors only within the narrow band of health services to which chiropractors limited themselves. Plaintiffs presented evidence intended to prove when and how the defendants came to a decision to trim and eventually perforate chiropractors' sails and when and how they chose and employed the means to that end. This evidence came largely from various officers and employees of the defendant organizations, called adversely, and from documents obtained from defendants' files. There was no way in which it could have been presented without revealing the low opinion of chiropractic entertained by medical doctors generally and the reasons for that opinion as stated from time to time by the medical doctors.
 
 
 42
 In plaintiffs' view of the Sherman Act, it was irrelevant whether the stated reasons, namely, ethical considerations springing from belief that chiropractic is dangerous quackery, were the true reasons or whether the true reasons were economic. But nothing was to be lost by plaintiffs, so far as the jury was concerned, by innuendo that money and not ethics spurred on the medical doctors.
 
 
 43
 In mild degree, there was dispute whether particular defendants had done the things plaintiffs alleged; in higher degree, whether there was competition between chiropractors and medical doctors; and in yet higher degree, whether defendants' conduct had in fact impaired chiropractors' ability to compete.[7] But in the district court, before and during trial, defendants were insistent that under the Sherman Act, available defenses were that their conduct had been undertaken in the interest of public health, safety, and welfare and that their conduct had been non-commercial. The trial was dominated by defendants' efforts to persuade the jury that they had acted in the good faith belief that chiropractic is dangerous quackery. Evidence intended to show that chiropractic is indeed dangerous quackery was introduced to support the proposition that defendants' belief was genuine.
 
 
 44
 The upshot of all this was that much of the trial, and virtually all of the parties' arguments to the jury were a free-for-all between chiropractors and medical doctors, in which the scientific legitimacy of chiropractic was hotly debated and the comparative intensity of the avarice of the adversaries was explored.
 
 
 45
 During the pretrial stages and the trial, the able and experienced district judge suffered from the uncertainty which marks the law of boycotts by professionals: specifically, what legal justification, if any, exists for such boycotts when their effect is to restrain competition. From time to time, understandably, he described this core issue as "unique," "new waters," and "close." On the eve of trial, he embraced plaintiffs' contention that it was irrelevant whether defendants' conduct had been undertaken in the interest of public health, safety and welfare (the "public interest defense") and whether that conduct had been non-commercial, and he struck those attempted affirmative defenses. He agreed that a trial on the validity of chiropractic should not be allowed to develop; that it was for legislatures and not defendants to decide whether chiropractic should be permitted to exist; and that even if defendants could prove that their sole motivation was a sincere and well founded belief in the dangers of chiropractic, they could not escape liability for an otherwise unlawful boycott. But simultaneously he denied a broad motion by plaintiffs, in limine, to exclude evidence bearing on public health, safety or welfare. He expressed the opinion that evidence pertaining to defendants' "public interest" beliefs might bear on how to view and weigh evidence that defendants did or did not conspire; that such evidence might be necessary to determine whether a per se violation of the Sherman Act had occurred; and, if significant in amount, such evidence might be relevant to rule of reason analysis. He also observed that such evidence would necessarily bear on the nature and availability of the equitable relief plaintiffs were seeking (in addition to money damages). So he decided that defendants' "public interest" evidence should be allowed "if it is shown that such evidence is relevant, probative, and not cumulative." From the moment of their opening statements on through the trial, defendants pressed for the admission of their "public interest" evidence and over repeated objection the district court received it.
 
 
 46
 Whether the district judge enjoyed discretion to receive or not to receive this evidence is a question we will address in a moment. However, it is obvious that because it was received in such abundance, the significance of the jury instructions and the form of the verdict was sharply enhanced.
 
 
 47
 Although the verdict form requested by plaintiffs, acquiesced in by defendants, and used by the district court was "special" in the sense that the questions of causation and of the amount of the damages were separated from the other questions, it was general in that question 1 was simply whether each defendant "conspired to restrain trade within the meaning of Section 1 of the Sherman Act" (and question 2, whether each defendant conspired to monopolize or attempted to monopolize within the meaning of Section 2). That is, the liability issue (apart from the question of causation) was not broken down into a series of questions, from the answers to which the judge might have determined the judgment. Thus the district court found it necessary, in a bundle of instructions, to explain to the jury its duty, for example, first to address whether there had been a per se violation and, only if the jury decided that question negatively, then to address whether there had been a violation under the rule of reason.
 
 
 48
 We commend the use of more precise questions in an antitrust case of this kind.
 
 
 49
 Once the decision had been made to permit the jury to entertain the per se theory, it would surely have been helpful to the jury had the special verdict form embodied a set of fact questions bearing on the per se rule and another set bearing on the rule of reason, with a portion of the instructions expressly directed to the per se questions, and with an explanation in the verdict form itself that the jury's answers to the per se questions would determine whether the jury would be required to answer the rule of reason questions. If so required, the jury could have been told to answer them in the light of another portion of the instructions relating expressly to the rule of reason.
 
 
 50
 We do not consider it error to have submitted the case in the form of a single all-inclusive question on Section 1 of the Act. But because it was submitted in this manner, we are obliged to examine the instructions with particular care to determine whether they explained the law not only correctly, but reasonably understandably.
 
 A. Jury Instructions
 
 51
 The case presents difficulties, both theoretical and what may be called forensic or rhetorical. It was important that the court's instructions help the jury through both sets of difficulties.
 
 
 52
 On the theoretical side, the "boycott" which plaintiffs alleged and undertook to prove is surely not within any of the more familiar contexts. However, "[b]oycotts are not a unitary phenomenon." P. Areeda, Antitrust Analysis 381 (2d ed. 1974). "In its simplest aspects, a boycott ... is nothing more than an agreement among a number of economic actors to sever or limit economic relations with another economic actor or actors." Bird, Sherman Act Limitations on Noncommercial Concerted Refusals to Deal, 1970 Duke L.J. 247, 248.
 
 
 53
 Here, the jury was free to find that the services of one medical doctor were interchangeable with the services of other medical doctors; they competed with one another. The services of one chiropractor were interchangeable with the services of other chiropractors; they competed with one another. The services of a relatively small number of medical doctors were interchangeable with the services of all or nearly all chiropractors; they competed with one another. Superficially at least, the benefits to consumers arising from unrestrained competition could have been realized without any cooperation between any two medical doctors, between any two chiropractors, between any medical doctor and any chiropractor, or between an enclave of medical doctors and an enclave of chiropractors. The medical doctors, generally, were more than content with the absence of cooperation between two enclaves; the plaintiffs and chiropractors, generally, were not. The chiropractors contend that they would have gained economically had medical doctors referred patients to them, which seems accurate. The chiropractors seem also to contend that they would have gained economically had medical doctors accepted referrals from them, with the professional courtesies of exchanging reports and opinions, so as to permit the chiropractors better to serve their patients; this seems accurate because in the long run more persons will seek out chiropractors if chiropractic services are perceived to be beneficial. The chiropractors contend that those medical doctors who controlled the defendant medical associations influenced their colleagues to keep the medical doctor enclave intact.
 
 
 54
 The chiropractors contend that they would have gained economically had there been available to them: hospital facilities, laboratory facilities, X-ray-taking facilities, and the services of radiologists trained in reading X-rays. The chiropractors seem to contend that these facilities and resources were not available to them within their own enclave; that these facilities and resources are to be viewed as standing free of both enclaves; and that it is the members of the medical doctor enclave who caused these otherwise independent facilities and resources to be unavailable to the chiropractors, to the economic disadvantage of the latter.
 
 
 55
 This is not a case in which it is alleged or shown that the medical doctors, competitors of one another, have combined, for example, to fix the prices they will receive from consumers, and that they have agreed to ostracize or boycott those among them who fail to go along. It is not a case in which the medical doctors are alleged to have combined to boycott chiropractors in an attempt to coerce the chiropractors to behave in a certain economic manner, such as pricing.
 
 
 56
 What the antitrust law implications of all this may be for consumers of health care services, as distinguished from chiropractors as a group of health care providers, is difficult to discern. See Marrese v. American Academy of Orthopaedic Surgeons, 706 F.2d 1488, 1495-1496 (7th Cir.1983). In any event, in the absence of partial or plenary summary judgment or directions of verdict, they are implications which arise from facts which it was for the jury to have found, combined with law which it was for the judge to have explained in the instructions.
 
 
 57
 On the forensic or rhetorical side, as we have already observed, the opening statements, the evidence, and the closing arguments which the jury had heard and seen must have come through as if the jury was being called upon to decide whether in our society it is the medical doctors who are the heroes and the chiropractors the villains, or vice versa.
 
 
 58
 It is familiar law that we must look to the instructions as a whole, in a common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well. Even if we should discern error in one or more instructions, we will not reverse a judgment--especially after eight weeks of trial --unless we are persuaded the jury's understanding of the issues was seriously affected, to the prejudice of the plaintiffs. See, e.g., Beard v. Mitchell, 604 F.2d 485, 498 (7th Cir.1979).
 
 
 59
 We are persuaded that from the evidence, the statements of counsel, and the court's instructions, several basic points must have been well understood by the jury. The jury very likely understood that it was called upon to decide whether each of the defendants had agreed with others that the medical doctors would not refer patients to chiropractors and would not themselves consult or cooperate with chiropractors, and that hospitals and X-ray facilities would be placed off limits to chiropractors. If the jury made this finding, it very likely found as well that the boycotters: acted voluntarily and intended to do these things; intended the natural consequence that significantly fewer persons would consult chiropractors about certain health problems, such as back and neck pains; and were not displeased by the anticipation of this consequence.
 
 
 60
 But what this jury needed badly to know was whether "within the meaning of Section 1" it made a difference why the defendants had behaved in this intentional manner with this intended consequence. The jury could certainly have found that defendants had behaved in this manner: (1) because they believed that it would permit them to make more money than they would make if they did not do it; or (2) because they believed they were performing a public service in applying economic pressure to diminish or eliminate the general threat posed by chiropractic to public health, safety and welfare; or (3) because defendants respected scientific method as the basis for diagnosis and treatment and were unwilling to risk the health and lives of their patients by associating professionally in the care of patients with persons who (so defendants thought) do not share respect for scientific method; or (4) because of some combination of (1), (2) and (3). For brevity and convenience, we will refer to (1) as a money motive, (2) as a public interest motive, and (3) as a patient care motive.
 
 
 61
 The jury needed to know whether it should answer the verdict question yes or no if it found that a defendant's motive had been money alone, public interest alone, or patient care alone. It needed to know whether to answer yes or no if it found that a defendant had entertained two or all three motives, and, if so, whether it is legally significant that one motive was more powerful than another.
 
 1. Per se instructions
 
 62
 Over defendants' objection, the court granted plaintiffs' request that the jury be permitted to decide whether there had been a per se violation of Section 1 and, if not, then to apply the rule of reason in determining whether a violation had occurred. We have sustained a judgment for a plaintiff based upon a verdict by a jury which was permitted to proceed in this manner. Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 827 (7th Cir.1978), cert. denied 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979). However, before the jury is freed to find a per se violation, the trial court must determine that there is evidence from which the jury may find that the defendants engaged in certain conduct--for example, a horizontal agreement among competitors to fix prices charged to consumers--which conduct, the court (not the jury) must decide, constitutes a per se violation. In such a case, it must be explained to the jury that its function is to decide whether certain conduct, described with precision in the instruction, did or did not occur. It must be explained, also, that if the jury finds that the described conduct did occur, it must also find, without further factual inquiry, that section 1 was violated. In this important respect, the verdict as to a per se violation must be controlled by the court.
 
 
 63
 We will assume for a moment that in the present case there was evidence of conduct which constituted a per se violation of section 1 and, on that assumption, inquire whether the jury was properly instructed as to its function.
 
 
 64
 The jury was instructed that:(1) To establish per se unlawfulness, plaintiffs were obliged to show: (a) that defendants entered into "a concerted refusal to deal, engaged in by the participants primarily or in large part for the purpose of excluding competitors from the market"; and (b) "that the primary motivations for this refusal to deal were essentially commercial or economic in nature."
 
 
 65
 (2) Not all concerted refusals to deal are group boycotts of the kind the law deems per se unlawful. Those "that are of a noncommercial nature or character, ones that do not include among their principal aims the economic purpose of excluding competitors, may be lawful or unlawful depending on their reasonableness."
 
 
 66
 (3) "[I]f you find that any of the boycott conspiracies which plaintiffs have alleged were entered into to contain or eliminate chiropractors or to injure them in their ability to compete, ... you may not consider whether the resulting restraint of trade was reasonable or unreasonable. Conspiracies are illegal. However, if you find that the conspiracies existed, but not for the specific purpose of excluding chiropractors from the market or injuring them in their ability to compete, then you must determine whether the agreements imposed an unreasonable restraint on trade."[8]
 
 
 67
 The third of these instructions, including the use of the word "purpose" rather than "intent," resembles closely an instruction requested by the plaintiffs themselves, but the first and second were inconsistent with plaintiffs' requests.
 
 
 68
 Still assuming that from the evidence the jury could have distilled conduct on the part of one or more of the defendants which did indeed constitute a per se violation, the instructions were faulty in two major respects. First, unfairly to the defendants, the instruction failed to describe with sufficient precision the conduct which, if the jury found it to have occurred, constituted a per se violation. Second, unfairly to the plaintiffs, the instruction created a strong impression that conduct which would otherwise constitute a per se violation escapes that categorization if the "public interest motive" was the "primary" or "principal" motive.
 
 
 69
 As to the first point, the active role imposed upon the trial judge with respect to the concept of per se violations demanded that the jury be instructed that only if it found that a particular defendant had done A, B, C, and D, could it proceed to find that such conduct constituted a per se violation. But the only descriptions provided this jury were "a concerted refusal to deal" and "any of the boycott conspiracies which plaintiffs have alleged." We appreciate that elsewhere in the instructions, the elements of the alleged concerted refusal to deal were described (for example, refusal to refer patients, denial of access to hospitals, closing doors of educational programs). But the per se rule is extraordinarily severe and it was necessary for the jury to know whether it became operative only if the jury found that a particular defendant participated in all of the alleged misconduct or if it found participation in some but not all of the alleged misconduct. No guidance was provided in this respect.
 
 
 70
 As to the second point, taken together and taken in the context of all of the instructions, the jury was plainly led to believe that if the money motive was present but was not "primary" or "principal," even the most classical anti-competitive conduct would not constitute a per se violation. The jury may well have found that a generalized public interest motive was dominant with one defendant or another. If so, the jury was required by the instructions to withhold the per se violation label even from conduct--comparable to horizontal price-fixing, for example--to which the label would otherwise clearly attach. This was error. Arizona v. Maricopa County Medical Soc., 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); National Society of Professional Engineers v. United States, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).
 
 
 71
 It can fairly be said that the Supreme Court of the United States has been persistent and firm in its support of the per se doctrine. Since the trial of the case before us, the Court has pointedly described and endorsed its virtues. Arizona v. Maricopa County Medical Soc., 457 U.S. at 342-348, 102 S.Ct. at 2472-2475. Also, it is now firmly established that the members of learned professions and their professional associations are within the terms of Section 1 of the Sherman Act. Id. at 348-349, 102 S.Ct. at 2475-2476; Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Nor are the duration and depth of the judiciary's experience with the health care industry too little to permit application of the per se rule to a particular device, such as price-fixing, the anti-competitive effects of which have long been recognized. Arizona v. Maricopa County Medical Soc., 457 U.S. at 349-351, 102 S.Ct. at 2476-2477. Moreover, as recently as in Arizona v. Maricopa County Medical Soc., a price-fixing case, the Court quoted approvingly this language from Northern Pac. R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958): "Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, group boycotts, and tying arrangements." 457 U.S. at 344, n. 15, 102 S.Ct. at 2473 n. 15.
 
 
 72
 Nevertheless, we conclude that in the present case, the trial court should not have acceded, over defendants' objection, to plaintiffs' request that the jury be afforded the option to find a per se violation. It follows that any error in the per se instructions which was disadvantageous to plaintiffs was not prejudicial.
 
 
 73
 We reach this conclusion because we reject the assumption, in which we have indulged for the purpose of analysis, that facts could have been distilled by the jury from this record which would constitute a per se violation, and because the evidence of the "patient care motive" required that rule of reason analysis be applied.
 
 
 74
 This court has recently recognized in United States Trotting Ass'n v. Chicago Downs Ass'n, 665 F.2d 781, 787-90 (7th Cir.1981) (en banc ), "that boycotts are illegal per se only if used to enforce agreements that are themselves illegal per se--for example price-fixing agreements." Marrese v. American Academy, 706 F.2d at 1495. As we have observed, one of the peculiarities of the boycott which plaintiffs alleged and undertook to prove was that it was not used to compel either medical doctors or chiropractors to engage in certain economic behavior vis-a-vis consumers, such as price-fixing. The evidence was that the compulsion to be exerted upon medical doctors, hospitals, X-ray facilities, and laboratories through the conspiracy, if the jury found there was such intended compulsion, was to engage in the boycott itself, and not to exert, through the boycott, compulsion upon any one to do or to refrain from doing anything else. Particularly when a conspiracy of this sort is alleged in the context of a profession, the nature and extent of its anticompetitive effect are too uncertain to be amenable to per se treatment, as contrasted with treatment under the rule of reason.
 
 
 75
 Moreover, assuming the case were otherwise amenable to per se treatment, the presence of substantial evidence of motive (3)--the "patient care" motive--rendered the case inappropriate for per se treatment. In discussing the instructions on the rule of reason, we will comment further on the legal significance of the patient care motive. For the present, we note that in Goldfarb, 421 U.S. at 788, n. 17, 95 S.Ct. at 2013 n. 17, National Society of Professional Engineers v. United States, 435 U.S. at 696, 98 S.Ct. at 1367 (1978), and Arizona v. Maricopa County Medical Soc., 457 U.S. at 348349, 102 S.Ct. at 2476-2477, the Court has taken pains to preserve the possibility that a particular practice which could be viewed as a violation of the Sherman Act in another context, should be viewed and treated differently in the circumstances peculiar to a learned profession. We know from Professional Engineers and Maricopa County that an agreement to fix prices will not escape per se treatment simply because it is entered into by professionals and accompanied by ethical protestations. But a canon of medical ethics purporting, surely not frivolously, to address the importance of scientific method gives rise to questions of sufficient delicacy and novelty at least to escape per se treatment.
 
 2. Rule of reason instructions
 
 76
 A famous articulation of the rule of reason appears in Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918):
 
 
 77
 The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.
 
 
 78
 In National Society of Professional Engineers v. United States, 435 U.S. at 691, 98 S.Ct. at 1365, referring to Chicago Board of Trade, the Court stated that for sixty years it had "adhered to the position that the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition."
 
 
 79
 Plaintiffs in the present case requested a rule of reason instruction which stated plainly that: the rule focuses directly on the challenged restraint's impact on competition; the question is whether the agreement merely regulates and thereby promotes competition or is such as may injure or suppress or even destroy competition; and a restraint is not illegal if on balance it promotes competition or has no effect upon competition, but is illegal if on balance it suppresses or injures competition. The trial court declined to give this instruction, and it gave the following instructions on the rule of reason as the jury was to apply it in this case:
 
 
 80
 One of the factors to be considered in determining whether any agreement in restraint of trade is unreasonable is whether it has or is likely to have unreasonable effects. The law is not concerned with restraints of trade that are not anticompetitive in purpose unless they also have a substantial adverse effect on the marketplace.
 
 
 81
 One of the factors you should consider in judging reasonableness is the effect of the defendants' practices on competition, if any, that exists between chiropractors generally and medical doctors. You have been instructed as to the definition of the term "competition" in an antitrust case such as this, and you must keep that definition in mind when considering whether there was any effect on competition.
 
 
 82
 If you find from the evidence that defendants engaged in activities, meaning direct, private activities, as distinguished from governmental activities, which have had a substantial effect in preventing chiropractors from offering services which are reasonably interchangeable by consumers for the same purposes as the services offered by medical doctors, that would be an element weighing on the side of unreasonableness. If, on the other hand you find from the evidence that the defendants' activities did not have any substantial effect in preventing chiropractors from offering such services as licensure permits, that would be an element weighing on the side of the reasonableness of the defendants' activities.
 
 
 83
 If you find that the conduct complained of on the part of the defendants was not so motivated by economic considerations that it amounted to a per se violation of the antitrust statutes, you then must consider whether the actions of those defendants in agreeing to adopt and enforce certain ethical standards or principles as a means of eliminating or preventing associational activities between chiropractors and medical doctors had the effect of unreasonably restraining the trade of chiropractors.
 
 
 84
 In this regard, it is a proper function of professional associations to formulate and express principles concerning desirable standards of professional conduct and service. This is so because such principles may benefit the public by raising professional standards generally, and by helping to insure that the profession merits the trust that the public necessarily places in its members. Such principles also assist members of the profession by giving them guidance as to generally accepted standards of conduct in their profession.
 
 
 85
 In judging whether a particular professional standard in operation produces an unreasonable restraint of trade, it is necessary to consider the genuineness of the justification advanced in support of the standard, the reasonableness of the standard itself, the manner of its enforcement, and the effects of it on the relevant area of trade or commerce.
 
 
 86
 The fact that an ethical standard which affects the conduct of one profession, such as medical doctors, may also have an indirect effect on the activities of another profession, such as chiropractors, does not alone mean that it amounts to an unreasonable restraint of trade. Rather, the determination to be made is whether, as a consequence of the operation of that standard, there has been a cognizable adverse effect on the public interest in the sense that the opportunity of chiropractors to provide services they are licensed to provide and the opportunity of the public to receive those services has been unreasonably impaired or obstructed.
 
 
 87
 [Y]ou are further instructed that chiropractors have been given the right by law to carry on their practice and to engage in the treatment of patients, subject to whatever legal limits are placed on their licenses. The question of whether chiropractic poses an impermissible hazard to the health and welfare of the public is one for the Congress and/or the state legislatures to resolve, not the defendants or other private persons or groups. Because those legislative entities alone have the authority to determine whether chiropractors should be permitted to offer their services to the general public, the law will not allow their decision to be overturned.
 
 
 88
 It is a different question, however, whether members of the medical profession may limit their own relationships with chiropractors for the purpose of practicing their own profession according to standards they consider necessary or desirable for the proper practice of medicine. As I have already instructed you, reasonable ethical principles having that objective and not aimed at barring the practice of chiropractic within the limits allowed by state licenses may be lawful if they do not, in operation, also have a significant and unnecessarily adverse effect on the chiropractors' ability to carry on their trade. You may, therefore, consider as bearing on the reasonableness of the defendants' purposes what the evidence shows to be the depth and sincerity of their beliefs that the sharing of responsibility by doctors with chiropractors poses substantial hazards to the welfare of patients and the public welfare.
 
 
 89
 Plainly the instructions as given failed to convey that the single standard is whether the challenged agreement is one that promotes competition or one that suppresses competition.
 
 
 90
 It is true, as defendants argue on appeal, that the instructions as given include the following points:
 
 
 91
 "One of the factors to be considered in determining whether any agreement in restraint of trade is unreasonable is whether it has or is likely to have unreasonable effects .... One of the factors you should consider in judging reasonableness is the effect of the defendants' practices on competition, if any, that exists between chiropractors generally and medical doctors." If the jury were to find that defendants' activities had had a substantial effect on the chiropractors' ability to compete, "that would be an element weighing on the side of unreasonableness." The determination to be made is whether "there has been a cognizable adverse effect on the public interest in the sense that the opportunity of chiropractors to provide services they are licensed to provide and the opportunity of the public to receive those services has been unreasonably impaired or obstructed." It is for legislative bodies alone to decide whether chiropractic should be permitted; they have decided that it should; "the law will not allow their decision to be overturned." Even ethical principles limiting the relationships of medical doctors with chiropractors for the purpose of protecting the medical doctors' own profession, and not aimed at barring the practice of chiropractic within the limits licensed by the state, are unlawful if, in operation, they "have a significant and unnecessarily adverse effect on the chiropractors' ability to carry on their trade."
 
 
 92
 The passages just summarized include every portion of the instructions which might be thought to approximate an instruction that the single standard is whether the challenged agreement merely regulates and perhaps thereby promotes competition or is such as may suppress or even destroy competition. In a case in which a "public interest motive" has not been made the centerpiece of the defense, an indulgent appellate court might conceivably decide that this portion of the instructions sufficiently approximated the single standard. But surely in the context of the present case, this is not possible. To instruct that "the effect of the defendants' practices on competition" is "one" of the factors in judging reasonableness and that "a substantial effect in preventing chiropractors from offering services" in competition with medical doctors is "an" element weighing on the side of unreasonableness is unmistakably to suggest that the jury was free, even obliged, to weigh factors unrelated to impact on competition. The expression "unnecessarily adverse" can mean only that an adverse effect on competition may be "reasonable," within the meaning of the rule of reason, if there is a necessity for it arising from some value unrelated to free competition.
 
 
 93
 Any possibility that the instructions as given sufficiently approximated the single standard of promoting or suppressing competition is dispelled by other portions of the instructions on the rule of reason. After being told of the importance of ethical canons in raising professional standards generally and in insuring that public trust in the members of the profession is merited, the jury was instructed that in judging whether a particular professional standard, in operation, produces an unreasonable restraint of trade, it was "necessary to consider the justification advanced in support of the standard, the reasonableness of the standard itself, the manner of its enforcement," as well as "the effects of it on the relevant area of trade or commerce." Again, the implication is unmistakable: the "reasonableness" of the standard, in terms of values unrelated to free competition (in this case, generally raising the standards of the medical profession and insuring that the public trust in that profession is merited), is a factor which it is "necessary" for the jury to consider in addition to its consideration of the standard's effects on competition.
 
 
 94
 We appreciate that in the classic exposition in Chicago Board of Trade, it was said that facts relevant to the test of promotion or suppression of competition include: "[t]he history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, [and] the purpose or end sought to be attained ...." 246 U.S. at 238, 38 S.Ct. at 243. But the Court followed this observation immediately with the statement that "[t]his is not because a good intention will save an otherwise objectionable regulation, ... but because knowledge of intent may help the court to interpret facts and to predict consequences." Id. We understand this to mean that it is effect or consequence which controls, not intent or motive. In ascertaining effect or consequence, it is useful to determine the setting in which the restraint was adopted and the effect or consequence which its instigators anticipated. An anticipated effect on competition may be somewhat more likely to have emerged as the true effect than an unanticipated effect. But in a claim for damages (as contrasted with injunctive relief), the true effect, as it has emerged, is the critical and sole factor.
 
 
 95
 On this appeal, defendants stoutly insist that the references in the instructions to the "genuineness" of the justification advanced in support of the standard, the "reasonableness" of the standard itself, and the "depth and sincerity" of defendants' beliefs about chiropractic, were all clearly subordinated to the inquiry blessed in Chicago Board of Trade. That is, as we understand the contention, defendants refrain, on this appeal, from disputing that the effect on competition is the single test. They contend that in determining that effect, it is useful to inquire into what the instigators anticipated the effect on competition would be; inquiry into that anticipation includes inquiry into the instigators' "reason for adopting the particular remedy" and the "purpose or end sought to be attained" by them; inquiry into what their true (as contrasted with pretextual) "reason," "purpose" or "end" may have been, in turn, may be affected by ascertaining their "genuineness," the "depth and sincerity" of their beliefs, and the "reasonableness" of the means they chose.
 
 
 96
 Conceivably, an instruction which explained this tortuous sequence might pass muster, but the instructions as given fail utterly to explain in understandable language the severely limited function of the inquiry, sanctioned by Chicago Board of Trade, into the reason for adopting the ethical canon and the purpose or end sought to be attained by it.[9]
 
 
 97
 In short, the instructions given cannot be defended successfully as an adequate approximation of a rule of reason test geared simply, clearly, and exclusively to the question whether the challenged conduct promoted or suppressed competition between medical doctors and chiropractors. We cannot escape the conclusion that in the district court, defendants flatly resisted the test geared exclusively to effect on competition and sought a modification which affords recognition to values other than those associated with unrestrained competition. The district court acceded to these urgings. From the jury's viewpoint, the result was ambiguity, an uncertain trumpet.
 
 
 98
 The judgment must be reversed unless: (1) the district court and we are free to modify the rule of reason test in this case involving Principle 3 of the AMA Principles of Medical Ethics; and (2) despite their ambiguity, the instructions adequately expressed the permissible modification, without prejudice to the plaintiffs' proper interests. We hold that the district court and we are free to modify the rule of reason test in a case involving a certain kind of question of ethics for the medical profession, but that the instructions as given failed to express a permissible modification and that prejudice to the plaintiffs resulted.
 
 
 99
 As we have noted, in the course of its relatively recent application of the Sherman Act to the professions, including the medical profession, the Supreme Court has been markedly careful to preserve the courts' freedom to discriminate between nonprofessional and professional activities, in construing and applying the Act. "The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently ...." Goldfarb v. Virginia State Bar, 421 U.S. at 787, n. 17, 95 S.Ct. at 2013 n. 17, "[B]y their nature, professional services may differ significantly from other business services, and, accordingly, the nature of the competition in such services may vary." National Society of Professional Engineers v. United States, 435 U.S. at 696, 98 S.Ct. at 1367. It is true that in National Society of Professional Engineers, the theme from Goldfarb was echoed in a context in which the Court was emphasizing the narrow limits of the theme and was making clear that even in the setting of the profession of engineering, even in the face of a possibly accurate contention that the consequence of competitive bidding would be corner-cutting dangerous to the users and consumers of products, "the Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable." Id. Moreover, in Arizona v. Maricopa County Medical Society, 457 U.S. 332, 102 S.Ct. 2466 (1982), the Court held it not only a violation of the rule of reason, but a per se violation, for medical doctors to agree upon maximum fees that they might claim in full payment for health services provided to policyholders of specified insurance plans, despite the doctors' contention that the agreement facilitated the successful marketing of an insurance plan in which the participating medical doctors had no financial interest and which apparently was beneficial to consumers.
 
 
 100
 Conscious of the narrowness of the range of the preserved opportunity for differential treatment of professions and nonprofessions under the Sherman Act, we believe that the considerations reflected in the AMA's Principle 3 fall within that range. In his concurrence in National Society of Professional Engineers v. United States, Justice Blackmun regretted the intimations he found in the Court's opinion that any ethical rule with an overall anticompetitive effect promulgated by a professional society is forbidden by the Act. He expressed the view that flexibility should remain, in the professional context, to "take account of benefits other than increased competition" and to recognize "that there may be ethical rules which have a more than de minimis anticompetitive effect and yet are important in a profession's proper ordering." 435 U.S. at 699-700, 98 S.Ct. at 1369-1370.
 
 
 101
 In the case at hand, evidence of what we have referred to as the "patient care motive" was that when they enter into a doctor-patient relationship with specific persons, medical doctors believe it is essential to bring scientific method to bear upon diagnosis and treatment. There was evidence of their belief that to collaborate with chiropractors in the care of persons who are patients of the medical doctors is to compromise the application of scientific principles, to violate the oaths taken by the medical doctors, and to introduce risk to the health and lives of the patients for whom the medical doctors have accepted responsibility. Clearly, an individual medical doctor is free to act on this belief by declining to associate with a particular chiropractor in the care of a particular patient. It seems reasonable that two or three medical doctors, sharing this view and working as a team in the care of a particular patient, would be free to agree, and to act on the agreement, to decline to associate with a particular chiropractor in the care of that patient. The Sherman Act problem in the present case arises from the express embodiment of this viewpoint in a formal set of ethical principles promulgated by a large association of medical doctors, and by the alleged efforts of that association and kindred associations to give effect to the exclusionary attitude in the setting of hospitals staffed by medical doctors.
 
 
 102
 If it should be determined eventually in this case that the Sherman Act was violated, that determination should not rest on insistence that the Act is indifferent to, or even hostile to, the value of permitting medical doctors to honor in their practice what they perceive to be scientific method, or indifferent to or hostile to the value of encouragement, from within the profession, to its members to honor scientific method by declining to associate with those thought to dishonor it. A value independent of the values attributed to unrestrained competition must enter the equation. The reasonableness of any resulting restraint on competition must be determined by a reconciliation of values of differing kinds. Because Congress has for so long assigned such pronounced value to freedom of competition and the Supreme Court has for so long applied the rule of reason so as virtually to exclude other values (except, for example, the value of activity protected by the first amendment), the adaptation of the rule of reason in the Principle 3 setting should impose a heavy burden on those who would justify conduct having significant anticompetitive effect.
 
 
 103
 The jury should be instructed in appropriate language to the following effect: The burden of persuasion is on the plaintiffs to show that the effect of Principle 3 and the implementing conduct has been to restrict competition rather than to promote it. If the plaintiffs have met this burden, the burden of persuasion is on the defendants to show: (1) that they genuinely entertained a concern for what they perceive as scientific method in the care of each person with whom they have entered into a doctor-patient relationship; (2) that this concern is objectively reasonable; (3) that this concern has been the dominant motivating factor in defendants' promulgation of Principle 3 and in the conduct intended to implement it; and (4) that this concern for scientific method in patient care could not have been adequately satisfied in a manner less restrictive of competition.
 
 
 104
 We hold that this requirement does not constitute an affirmative defense which must be pleaded. Fed.R.Civ.P. 8(c). We hold, however, that if plaintiffs meet their burden to show that the effect has been to restrict competition, they make a prima facie showing that the restraint has been unreasonable, within the meaning of Section 1 of the Sherman Act. Only if the defendants then meet their burden, as described, does their conduct escape condemnation as unreasonable. We commend the use of a special verdict to permit the jury to understand clearly the nature and sequence of the questions it must answer, and where the burden of persuasion lies with respect to each question.
 
 
 105
 In Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), the Court recognized a value in the absence of the use of fraudulent techniques within the New York Stock Exchange and recognized that vindication of this value was the dominant goal of the Exchange. Nevertheless, it found that the means chosen to vindicate the value was not the least restrictive available to achieve substantial vindication. Similarly, in National Society of Professional Engineers v. United States, the challenged rule of the Society was "grossly overbroad." 435 U.S. at 699-700, 98 S.Ct. at 1369-1370. (Blackmun, J., concurring).
 
 
 106
 We appreciate that the last paragraph of that segment of the rule of reason instructions we have quoted above bears resemblance to the adaptation of the rule we have discussed. It refers to limitation of relationships with chiropractors for the purpose of practicing medicine according to standards deemed necessary or desirable; to principles having that objective and not the objective of barring chiropractic within its licensed limits; and to the absence of "a significant and unnecessarily adverse effect on the chiropractors' ability to carry on their trade." However, if any modification of the single-test rule of reason (promotion versus suppression of competition) is permissible, the modification must be explained to the jury forthrightly and precisely, and in particular the least restrictive means requirement must be set forth more understandably than by the use of the single word "unnecessarily" in the phrase "significant and unnecessarily adverse effect on the chiropractors' ability to carry on their trade."
 
 
 107
 There is another important respect in which the instructions were inadequate and prejudicial to plaintiffs: they failed to distinguish sharply enough between the "public interest motive" and the "patient care motive."
 
 
 108
 The patient care motive could explain nothing more than the refusal by the medical doctors, and the hospitals staffed by medical doctors, to associate with chiropractors in the treatment of patients. It could not explain, for example, defendants' efforts to persuade Congress, state legislatures, and federal and state agencies to enact laws and to promulgate rulings to contain or to eliminate chiropractic. The motive for this "political" activity, the jury must have found, was either the money motive or the generalized public interest motive, or a combination of the two. We will assume, for the moment, that the jury found the political activity to be entirely protected by the first amendment (see III A3, infra ). A critical question for the jury was whether defendants conspired to contain and to eliminate chiropractic generally, not only by waging constitutionally protected political warfare, but by waging economic warfare; that is, by engaging in aspects of the alleged boycott not limited to a refusal to associate in the care of specific patients. If the jury found that defendants had indeed engaged in economic warfare against chiropractic generally, beyond a refusal to associate in the care of specific patients, it was important that the jury understand that a generalized public interest motive affords no legal excuse for such economic warfare.
 
 
 109
 Since at least as early as 1941 when Fashion Originators' Guild of America, Inc. v. FTC, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949, was decided, it has been clear that private persons and entities may not presume to function as "an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce." Id. at 465. It is true that medical doctors are better qualified than most members of the public to form an opinion whether chiropractic poses a threat to public health, safety and welfare. They are free to attempt to persuade legislatures and administrative agencies. But a generalized concern for the health, safety and welfare of members of the public as to whom a medical doctor has assumed no specific professional responsibility, however genuine and well-informed such a concern may be, affords no legal justification for economic measures to diminish competition with some medical doctors by chiropractors.
 
 
 110
 The jury was instructed that chiropractic was lawful within the limits imposed by Congress and state legislatures; that whether chiropractic poses an impermissible hazard to the health and welfare of the public is for Congress and state legislatures to resolve; and not for the defendants; and that the law will not allow the legislative decision to be overturned. The jury was then told that it is a different question whether medical doctors may limit their own relationships with chiropractors.
 
 
 111
 Had the jury been instructed that the sole test under the rule of reason was the effect of defendants' conduct on competition and that the jury must disregard evidence both of defendants' public interest motive and of their patient care motive, plaintiffs would have suffered no prejudice, of course. But when the district court ventured to instruct that defendants' concerns with the perceived threat of chiropractic were relevant to the jury's task, it was essential that a line be drawn sharply and unmistakably between evidence of the public interest motive and evidence of the patient care motive. We conclude that such a line was not drawn with sufficient emphasis and clarity.
 
 
 112
 We conclude that the instructions to the jury were prejudicially erroneous in two respects. The overriding question in the case was whether, in applying the rule of reason, the jury was to be allowed to consider any factor whatever beyond the effect of defendants' conduct on competition. The district court elected to permit the jury to go beyond that single test and to consider the defendants' motives. But it failed to confine that consideration sharply to defendants' patient care motive, as contrasted with their generalized public interest motive. And, with respect to the patient care motive, the court failed to convey clearly and understandably the manner in which the jury was to weigh it, particularly as to the least restrictive means requirement.
 
 
 113
 The verdict and the judgment cannot stand.
 
 3. First amendment
 
 114
 There was evidence of considerable activity on the part of one or more of the defendants directed to winning or defeating bills in Congress and in state legislatures, and other activity directed to federal and state agencies responsible for administering laws in the health care field.
 
 
 115
 Plaintiffs assert that two instructions on freedom of speech and association labelled all speech and writing as protected by the Constitution, thus suggesting that defendant AMA's ethical canons could not be a basis for finding a Section 1 violation unless the canons were coercively enforced. The instructions at issue were general descriptions of first amendment rights, merely a part of the court's statements on the relationship between the first amendment and the Sherman Act. Subsequent instructions limited the general instructions on first amendment rights.
 
 
 116
 The Noerr-Pennington doctrine extends protection to businesses and other associations when they join together to petition legislative bodies, administrative agencies, or courts for action that may have anticompetitive effects. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). In California Transport, the Court created the "sham" exception to the doctrine:
 
 
 117
 "[A] pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, viz., effectively barring respondents from access to the agencies and courts. Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of "political expression."
 
 
 118
 404 U.S. at 513, 92 S.Ct. at 613. See also Otter Trail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (antitrust liability attaches when repetitive lawsuits raising unsubstantial claims evidence goal of suppressing competition). The sham exception exposes fraudulent and illegitimate petitioning activities to Sherman Act prohibitions.
 
 
 119
 Plaintiffs complain that the court's explanation substantially distorted the Noerr-Pennington doctrine and the sham exception by instructing the jury that defendants' advocacy activity directed to legislative and administrative agencies or bodies was protected if "the defendants undertook such efforts to influence governmental bodies with a sincere purpose to obtain the governmental actions that they sought."
 
 
 120
 Plaintiffs' contention is without merit. In Noerr, the defendants had conducted a publicity campaign which the plaintiffs claimed was distorted and directed to harming the plaintiffs' public image more than to obtaining legislative action. The Court agreed that the publicity campaign fell "far short of the ethical standards generally approved of in this country." 365 U.S. at 140, 81 S.Ct. at 531. But as long as the defendants "were making a genuine effort to influence legislation," their actions did not violate the Sherman Act. Id. at 144, 81 S.Ct. at 533. Thus, the trial court's statement in this case properly explained an important aspect of the Noerr-Pennington doctrine. See Federal Prescription Service v. American Pharmaceutical Association, 663 F.2d 253 (D.C.Cir.1981), cert. denied, 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982).
 
 4. Coercive enforcement
 
 121
 Plaintiffs contend the trial court incorrectly instructed the jury that it could not find the requisite agreement unless the ethical canons at issue were coercively enforced.
 
 
 122
 It is not essential to a conspiracy under the Sherman Act that the conspirators possess or demonstrate their power to carry out their anticompetitive plan. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224, n. 59, 60 S.Ct. 811, 844 n. 59, 84 L.Ed. 1129 (1940). In National Society of Professional Engineers v. United States, a provision of the society's code of ethics prohibited members from providing price information to potential clients which would permit the latter to make price comparisons among those performing engineering services. The district court found the society had "actively pursue[d] a course of policing adherence to the competitive bid ban through direct and indirect communication with members and prospective clients," and had "engaged in educational campaigns and personal admonitions to members and clients who were suspected of engaging in competitive bidding practices." U.S. v. National Society of Professional Engineers, 389 F.Supp. 1193, 1200 (D.D.C.1974). In Supreme Court argument, the society claimed it had never enforced the ban on competitive bidding. The Court deemed the lower court's finding sufficient to fulfill the Sec. 1 agreement criterion. 435 U.S. at 684, n. 5, 98 S.Ct. at 1361 n. 5. In Goldfarb v. Virginia State Bar, the Court noted the power the state bar association's ethical opinions on minimum-fee schedules exerted over its members:
 
 
 123
 [The] opinions threatened professional discipline for habitual disregard of fee schedules, and thus attorneys knew their livelihood was in jeopardy if they did so. Even without that threat the opinions would have constituted substantial reason to adhere to the schedules because attorneys could be expected to comply in order to assure that they did not discredit themselves by departing from professional norms, and perhaps betraying their professional oaths.
 
 
 124
 421 U.S. at 791, n. 21, 95 S.Ct. at 2015, n. 21. Thus, even without coercive enforcement, a court may find that members of an association promulgating guidelines sanctioning conduct in violation of Sec. 1 participated in an agreement to engage in an illegal refusal to deal.
 
 
 125
 Plaintiffs' complaint is specifically addressed to two instructions as given. One stated in pertinent part:
 
 
 126
 In considering the first element [of a group boycott]--that is, whether there was an agreement to engage in, or to coerce others to engage in, a concerted refusal to deal with chiropractors--you should consider what the evidence shows to be the manner and extent of enforcement of the ethical standards involved in the case.
 
 
 127
 The effect of an ethical principle in restraining trade, if there is any such effect, depends upon the extent to which it actually operates to limit the freedom of persons to whom it is addressed. An ethical standard may serve as a guideline, advice or recommendation to medical doctors, leaving them free to evaluate the principle and to make their own decisions as to what constitutes sound ethical practice. On the other hand, such a rule may be regarded by doctors as a binding rule which they are required in all circumstances to follow. You must determine, therefore, whether the ethical standards in this case operated only as guidelines or whether they were employed to, and/or had the effect of, controlling the actions of members of the medical profession.
 
 
 128
 Another instruction given concerned the liability of defendant AHA, and said: "You may not find the AHA liable for any action taken against the plaintiffs by individual hospitals in this case unless plaintiffs have proven that those hospitals are members of the AHA and that AHA intentionally coerced or induced that action."
 
 
 129
 The district court refused to instruct the jury that proof of coercive enforcement was not required, as requested by plaintiffs:
 
 
 130
 There need be no assurances among the conspirators, either oral or in writing, to the effect that they would adhere to the plan. Nor is it necessary that there exist a coercive mechanism by which the conspiracy may be enforced. It is enough that a mutual understanding was reached, and that the defendants in fact conformed to the arrangement.
 
 
 131
 The instructions as given were unfortunately ambiguous, but they did not state that coercive enforcement was required. One mentioned enforcement, but did not imply that coercive enforcement action was necessary. Another mentioned coercive enforcement only in the disjunctive: "coerced or induced." Although plaintiffs' proposed instruction correctly states the law, the court did instruct the jury that:
 
 
 132
 What the preponderance of the evidence in the case must show, in order to establish proof that a conspiracy existed, is that the members in some way or manner, or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.
 
 
 133
 Sufficiently to avoid the necessity of reversal on this ground, this instruction described the nature of the agreement plaintiffs had to prove.[10]
 
 5. Apparent authority
 
 134
 Significant evidence bearing on the conspiratorial conduct of JCAH, AHA, and ISMS related to certain employee conduct, which witnesses testified was unauthorized by those organizations. The district court denied plaintiffs' request for a jury instruction to the effect that an association may be liable for the conduct of employees who have acted with apparent, but not actual, authority. The instruction given stated only that an association is responsible for acts done within the scope of an employee's authority, explaining that the existence of authority may be shown by circumstantial evidence. American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), decided subsequently to the trial in the case before us, holds flatly that apparent authority is sufficient to support civil antitrust liability on the part of a standard-setting organization. The evidence was sufficient to permit the jury to find that JCAH and AHA--and ISMS in association with JCAH and AHA--were standard-setting organizations. The factual record requires us to hold that with respect to defendants JCAH, AHA and ISMS, plaintiffs were prejudiced by the district court's erroneous refusal to instruct the jury on the significance of apparent authority of employees.
 
 B. Admission of evidence
 
 135
 Even if reversal were not required by reason of error in the jury instructions, we would be obliged to reverse by reason of the ruling receiving in evidence the volume of evidence about the Parker School of Chiropractic and about the plaintiff Bryden's one-time arrangement with a furniture store on the sale of mattresses to Bryden's patients. We would do so with great reluctance, recognizing keenly the difficulties encountered by a trial judge in a trial of this length and complexity. The evidence was relevant to the genuineness of the defendants' belief that chiropractic is quackery. That is, evidence tending to show that chiropractic is in fact quackery is probative that defendants genuinely entertained the belief that it is quackery. But the genuineness of defendants' beliefs on that subject, whatever its proper legal significance in the trial, is a subject that could have been addressed with a less extravagant volume of evidence, and with far less emphasis upon alleged financial greed. The items we have specified created such a danger of unfair prejudice and confusion of issues that it was an abuse of discretion not to exclude it under Fed.R.Evid. 403.
 
 C. Unclean hands
 
 136
 Before trial, the district court correctly granted plaintiffs' motion to strike the affirmative defense of unclean hands, thus barring evidence that plaintiffs had themselves violated the antitrust laws. See Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 139, 88 S.Ct. 1981, 1984, 20 L.Ed.2d 982 (1968), and Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 214, 71 S.Ct. 259, 95 L.Ed. 219 (1951). As the cross-examination of plaintiff Bryden was about to commence, plaintiff's counsel moved for an order barring defendants from inquiring of him about an arrangement Bryden had had with a furniture store for a payment to Bryden when, upon his recommendation, a patient purchased a certain type of mattress. The district court denied the motion on the ground that such testimony would be relevant to the genuineness of defendants' belief that chiropractic is quackery.
 
 
 137
 On cross-examination, Bryden acknowledged that, without the knowledge of his patients, he had had such an arrangement with the store. Asked by defendants' counsel whether he considered it ethical, Bryden responded: "It is probably as ethical as MDs owning pharmacies ...." Apparently to lessen the effect of Bryden's remark, examining defense counsel immediately referred, ambiguously, to a version of AMA's Principles of Ethics, already in evidence, and he suggested that it is unethical for medical doctors to own drug stores. From discussion out of the jury's hearing, it developed that such ownership is not unethical, if patients are not exploited.
 
 
 138
 Controversy developed with respect both to the mattresses and to the physician-owned drug stores, and eventually the court permitted the testimony about the mattresses to stand, instructed the jury to disregard defense counsel's attempt to describe what the AMA Principles say about physician-owned drug stores, and denied plaintiff's motion for a mistrial. In closing argument, defendants referred to Bryden's involvement in the arrangement "whereby in exchange for their endorsement and promotion of the firm's mattresses, the chiropractors would get a rake-off on each one sold." The trial court refused to give plaintiff's proposed instruction that unclean hands was not a defense in this case.
 
 
 139
 For reasons set forth in III B, above, we have concluded that plaintiffs were prejudiced by the volume and nature of the evidence which defendants were permitted to present, impugning the validity of chiropractic and the integrity of chiropractors. We believe that this prejudice could not have been overcome by an instruction to the effect that the clean hands defense was unavailable, and so we refrain from comment whether the failure to give such an instruction was error. Viewed in isolation, however, the episode concerning the mattresses and physician-owned drug stores did not require the district court to grant a mistrial.
 
 D. Reopening of Discovery
 
 140
 Plaintiffs sought to reopen discovery to investigate whether some defendants had attempted to prevent unilateral settlements in this case, contending that such attempts could constitute an independent violation of the Sherman Act. Defendants were granted a protective order barring the discovery. The trial court did not abuse its discretion, especially when discovery had continued for nearly four years and trial was imminent.E. Involvement of JCAH, AHA, ACP, ACS and ISMS
 
 
 141
 The evidence summarized under "Facts" in part II, above, clearly supports findings that there was considerable communication on the subject of chiropractic between the AMA, on the one hand, and, on the other, each of the five organizations which moved for a directed verdict; that this communication revealed acquiescence by all five organizations in the AMA view that chiropractic is quackery and cultism; that JCAH and AHA cooperated to give practical effect to this view by discouraging hospitals from permitting use of their facilities by chiropractors; that by their direct, formal and significant organizational participation in JCAH and by their own activities, ACP and ACS endeavored both to discourage hospitals from permitting use of their facilities by chiropractors and to discourage medical doctors from professional association with chiropractors; and that by adopting the AMA Principles of Medical Ethics and by embodying the Principles in its own policy manual, ISMS endeavored to discourage medical doctors from professional association with chiropractors. Had a reasonable jury made these findings, as it would have been free to do, the findings were sufficient to permit, although not to require, a finding that JCAH, AHA, ACP, ACS and ISMS each knew that concerted action in a scheme was contemplated and invited and that each acquiesced and participated in that scheme. Such a finding would have provided sufficient footing for liability in this civil antitrust action. See Theater Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954); Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226-227, 59 S.Ct. 467, 474-475, 83 L.Ed. 610 (1939). The district court did not err in denying the motions for directed verdicts in favor of these five defendants.
 
 F. The Section 2 Claim
 
 142
 The plaintiffs' asserted cause of action based on Section 2 of the Sherman Act was somewhat muted at trial and was virtually ignored on this appeal. Because of the rulings we have made on the Section 1 claim, relating to the admission of prejudicial evidence and to the legal significance of apparent authority, we reverse the judgment as to the Section 2 claim. We refrain from expressing an opinion with respect to any other matters as they bear on the Section 2 claim.
 
 IV. ORDER
 
 143
 The judgment appealed from is reversed and the case is remanded for a new trial.[11]
 
 
 
 *
 Judge Sprecher heard oral argument and participated in the conference which followed. He died May 15, 1982, and did not participate in the preparation or approval of this opinion
 
 
 **
 James E. Doyle, a Senior United States District Judge for the Western District of Wisconsin, is sitting by designation
 
 
 [1]
 Two defendant medical organizations settled prior to trial and thus were not parties to the judgment. Plaintiffs have not appealed from the judgment in favor of one defendant, the Chicago Medical Society. Plaintiffs' complaint named individual members of the defendant associations as co-conspirators but not as defendants
 
 
 [2]
 Section 1 of the Sherman Act declares illegal "[e]very contract, combination ..., or conspiracy in restraint of trade or commerce ...." 15 U.S.C. Sec. 1 (1970). Section 2 prescribes penalties for "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce ...." 15 U.S.C. Sec. 2 (1970)
 
 
 [3]
 On appeal, plaintiffs raise no claim based solely on Sec. 2. They assert conclusorily that the trial court erred with regard to those claims in its jury instructions on conspiracy, its failure to instruct the jury that good motives do not constitute a defense to either Sec. 1 or Sec. 2 violations, and its admission of evidence on defendants' public health and welfare motives. They do not present specific argument on these issues. Since we treat each of these points in light of plaintiffs' Sec. 1 claims, and since plaintiffs failed to raise the Sec. 2 claims in any meaningful fashion on appeal, we do not address separately their general assertion of claims based solely on Sec. 2
 
 
 [4]
 Spinal manipulation also is practiced by osteopathic physicians, physical therapists, and a small number of medical doctors
 
 
 [5]
 This memorandum was characterized as a report of the Committee's activities during the previous seven years
 The memorandum said: "The Committee has not submitted such a report [earlier] because it believes that to make public some of its activities would have been and continues to be unwise. Thus this report is intended only for the information of the Board of Trustees."
 
 
 [6]
 Defendant ACP argues that the trial court erred in admitting this exhibit, or alternatively, that the exhibit could not be the basis of an antitrust violation, because the activities it described were protected by the Noerr-Pennington doctrine. Some of the committee's recommendations were directed toward protected activities. But others were not. That some activities of a particular organization are protected by the first amendment does not shield all its activities, under Noerr-Pennington
 
 
 [7]
 In part II, above, we have set forth those facts concerning what defendants actually did and with what effect, that a reasonable jury could have found from the evidence when viewed most favorably to plaintiffs. In all that follows, we will assume that the jury did make such findings. In this manner, the significance of error in the conduct of the trial, if any, can be tested
 
 
 [8]
 "Conspiracies are illegal" is taken from the reporter's transcript of the instructions as read by the trial judge. It is clear from the joint appendix that the judge intended to say: "The conspiracies are illegal." Whether the error was his or the reporter's, we are sure that the jury understood the reference to be to the kind of conspiracies described in the immediately preceding sentence
 
 
 [9]
 Defendants explain that the phrases "genuineness of the defendants' justification" and "reasonableness of the standards themselves" were drawn from Feminist Women's Health Center, Inc. v. Mohammad, 586 F.2d 530 (5th Cir.1978), cert. denied, 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). An abortion clinic claimed, among other things, that the defendant medical doctors had conspired to boycott it, and the district court granted defendants' motion for summary judgment. In reversing in part, the court of appeals commented that even if defendants' efforts to enforce professional standards were to be tested by the rule of reason, rather than the per se rule, factual issues remained "as to the genuineness of the defendants' justification, the reasonableness of the standards themselves, and the manner of their enforcement." Id. 586 F.2d at 547. The Fifth Circuit's choice of words in its cryptic dealing with this summary judgment question cannot fairly be accorded the immense significance attributed to it by defendants in the context of the case before us
 
 
 [10]
 Plaintiffs contend, also, that the court failed to instruct on one of their conspiracy theories: namely, that the individual members of each defendant organization conspired among themselves. Although not explicit on the point, the instructions as given (e.g., "plaintiffs ... have alleged that ... the defendants and their members have agreed ....") were sufficient to reveal to the jury that this was one of plaintiffs' theories
 
 
 [11]
 The motion by the Health Care Equalization Committee of the Iowa Chiropractic Society, pursuant to Federal Rules of Appellate Procedure 27, for the limited purpose of obtaining access to discovery, is denied