**Dr. Larry JOHNSON, D.C., et al., Plaintiffs,**

v.

**BLUE CROSS/BLUE SHIELD OF NEW MEXICO, et al., Defendants.**

**CV No. 83–1637 HB.**

United States District Court, D. New Mexico.

May 14, 1987.

Vernon W. Salvador, Peter E. Moughan, Jr., Albuquerque, N.M., for Johnson & Moskowitz.

Kent Winchester, Albuquerque, N.M., for Coffman, Plaman and Pfeiffer.

Marianne Bennett, Robert W. Botts, Albuquerque, N.M., Charles J. Steele, Jacqueline M. Saue, Pierson, Ball & Dowd, Washington, D.C., Robert A. Johnson, David L. Spoede, John P. Eastham, Kemp, Smith, Duncan & Hammond, P.C., Albuquerque, N.M., for Blue Cross/Blue Shield.

Howard F. Houk, Albuquerque, N.M., for New Mexico Medical Society.

## MEMORANDUM OPINION AND ORDER

BRATTON, Senior District Judge.

This matter comes before the court on a motion for summary judgment by defendants New Mexico Blue Cross and Blue Shield, Inc. (Blue Cross) and the New Mexico Medical Society. Oral arguments on the motion were held on April 14, 1987. The court, having considered the motions, the memoranda and exhibits submitted by the parties in conjunction therewith, and consulted the applicable authorities, concludes that defendants' motion lacks merit and will be denied.

This is an antitrust action arising out of defendants' alleged conspiracy or agreement, resulting in Blue Cross' refusal to provide health cost reimbursement coverage for chiropractic services. Plaintiffs are licensed chiropractors. Blue Cross is a non-profit New Mexico corporation, in the business of providing health care cost reimbursement to its subscribers. It operates by contracting with participating physicians and hospitals; these physicians and hospitals agree to accept as their fees the "usual, customary rate" for their services, as determined by Blue Cross. When a subscriber is treated by a participating physician, the subscriber pays no fee; the physician is paid directly by Blue Cross, at the rate determined to be usual and customary by Blue Cross. Until 1981, Blue Cross did not offer coverage for services rendered by chiropractors. At that time, it began to provide chiropractic coverage to those group plans that requested it. In 1985 Blue Cross was required by state statute to

include chiropractic coverage in all of its plans, and has done so since that time.

Section 1 of the Sherman Act prohibits "[e]very contract, combination ..., or conspiracy, in restraint of trade[.]" 15 U.S.C. § 1. Plaintiffs allege that defendants violated section 1 of the Sherman Act by conspiring and refusing to provide coverage for chiropractic services while providing coverage for identical services when performed by medical or osteopathic physicians. Defendants urge this court to grant their motion for summary judgment, arguing that they did not conspire, and that their conduct did not result in a restraint of trade.

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to " 'secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United States,* 590 F.2d 884, 887 (10th Cir.1979), the burden on the moving party may be discharged by demonstrating the absence of evidence to support the nonmoving party's case. *Celotex, supra* 477 U.S. at 325, 106 S.Ct. at 2554. In such a situation, the moving party is entitled to judgment as a matter of law, "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 324, 106 S.Ct. at 2553.

The conspiracy prohibited by section 1 of the Sherman Act may be demonstrated by evidence showing that the defendants shared a conscious commitment to a common scheme designed to achieve an unlawful objective. *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984). Plain-

tiffs need not, however, adduce direct evidence of an explicit agreement between conspirators; they may rely on inferences of agreement drawn from circumstantial evidence. *Norfolk Monument Co., Inc. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969). In this case, defendants argue that, at most, the evidence demonstrates independent action by Blue Cross. Independent action is not prohibited by the Sherman Act. *Monsanto Co. v. Spray–Rite, supra.* Plaintiffs must, therefore, come forward with evidence tending to exclude the possibility of independent action in order to withstand defendants' motion for summary judgment. *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

Plaintiffs allege that the conspiracy in this case consisted of an agreement between various physician officers of the New Mexico Medical Society, the New Mexico Medical Society itself, and Blue Cross, as well as various physician Directors of Blue Cross. Plaintiffs contend that as a result of this agreement, Blue Cross refused chiropractic coverage, which was an unreasonable restraint of trade. The following undisputed evidence supports plaintiffs' allegations.

In order to use the national Blue Cross trademark, New Mexico Blue Cross & Blue Shield was required to receive either the endorsement of the New Mexico Medical Society or have more than fifty percent of the state's practicing physicians as participating physicians with Blue Cross. Levin Deposition, 109. Physicians were aware that Blue Cross required their participation or the endorsement of the New Mexico Medical Society to retain their Blue Cross affiliation. Marshall Deposition, 37. Physicians have occupied approximately one-third of the seats on the Blue Cross Board of Directors since that organization's inception in New Mexico. Levin Affidavit, ¶¶ 21, 22. The physicians who have occupied those positions have been nominated by the New Mexico Medical Society. Levin Deposition, 119–125. Blue Cross was aware of a general feeling among physi-

cians that chiropractic was a form of folk medicine, or "quackery." *Id.* at 199.

During the years between 1974 and 1981, Blue Cross had vigorously lobbied against legislative efforts to require health care insurers to reimburse patients for services provided by chiropractors. *Id.* at 137–140. In May, 1981, however, the Executive Committee of the Blue Cross Board of Directors was told that there was a potential for 65,000 to 70,000 new subscribers in New Mexico if chiropractic benefits were provided. Exhibit 22. Three groups negotiating for contracts with Blue Cross had informed Blue Cross that chiropractic coverage had to be included in bids submitted by Blue Cross, or Blue Cross would not be awarded the contracts. Exhibits 22, 24. These groups included over 44,000 potential subscribers. *Id.* At the May 16, 1981 meeting of the Blue Cross Board of Directors, the Board approved the Executive Committee's recommendation to make available chiropractic benefits to groups demanding that coverage. Exhibit 24. The Board of Directors also unanimously voted to arrange a meeting with the New Mexico Medical Society leadership to discuss the reasons for Blue Cross' decision to include chiropractic coverage when demanded by the market. *Id.*

During the following six months, there were extensive communications and meetings between the President of Blue Cross, Thomas Levin, and physician members of the New Mexico Medical Society. On May 26, 1981, Dr. Richard J. Cronin resigned from the Blue Cross Board of Directors because of the Board's decision to provide chiropractic benefits. Exhibit 25. On June 6, 1981, a committee of the New Mexico Medical Society met with representatives of the Blue Cross Board of Directors, and, at the request of the President of the Medical Society, discussed the issue of Blue Cross coverage of chiropractic care. Exhibits 1, 27. On June 20, 1981, the Board of Directors of Blue Cross was told that thirty physicians had withdrawn their participating physician agreements with Blue Cross as a protest against the provision of chiropractic coverage. Exhibit 29. On July 15, 1981, Thomas Levin sent various documents to Dr. John Smoker, detailing the history of Blue Cross' attempts to "forestall the inclusion of chiropractic benefits in *all*" of its health care contracts. Exhibit 14 (emphasis in original). On August 1, 1981, Mr. Levin attended a meeting of the New Mexico Medical Society Council. Mr. Levin discussed the history of the issue of chiropractic coverage in order to show that Blue Cross' decision to offer such coverage was not voluntary. The Council adopted a resolution recommending the termination of the Medical Society's endorsement of Blue Cross. Exhibits 11, 31. On August 14, 1981, Dr. Pond, the President of the New Mexico Medical Society wrote to Mr. Levin, expressing regret at the Council's action, and reminding Mr. Levin that the Council's action still had to be approved by the House of Delegates at the annual meeting in November. Exhibit 33. On August 21, 1981, Mr. Levin responded to Dr. Pond's letter, and announced his intention to attend the House of Delegates meeting. Exhibit 34. On August 20, 1981, Mr. Levin responded to a letter from Dr. Floyd, and described the limited nature of the chiropractic coverage that was to be provided by Blue Cross. Exhibit 36.

■ The evidence submitted by plaintiffs provides circumstantial evidence of an agreement between the physicians of the New Mexico Medical Society and Blue Cross to deny chiropractic coverage in insurance policies issued by Blue Cross sufficient to defeat defendants' motion for summary judgment. Although mere contacts and communications between defendants, or the opportunity to conspire, is not sufficient evidence from which to infer an anticompetitive conspiracy, *Cooper v. Forsyth County Hospital Authority, Inc.*, 789 F.2d 278, 281 (4th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986), plaintiffs have brought forward sufficient evidence to support a finding that would exclude the possibility that Blue Cross acted independently and have demonstrated the existence of a genuine issue of material fact as to whether defendants entered into an agreement to achieve an unlawful objective.

■ Furthermore, an inference of a conspiracy may be drawn when a defendant acts in contradiction of its economic interests. *Schoenkopf v. Brown & Williamson Tobacco Corp.*, 637 F.2d 205, 208 (3rd Cir. 1980); *Kreuzer v. American Academy of Periodontology*, 735 F.2d 1479, 1488 (D.C. Cir.1984). Blue Cross recognized that it would be economically beneficial to cover chiropractic services by 1981, when the potential for 65,000 to 70,000 new subscribers existed. Exhibit 22. Once it determined that it would provide limited chiropractic coverage to those groups that demanded it as a condition to the submission of a bid for coverage, Blue Cross did not make chiropractic coverage available to all of its subscribers. Levin Deposition, 218. It also did not offer chiropractic coverage to new subscribers who did not demand it. *Id.* Blue Cross may be seen, therefore, to have acted against its own economic self-interest by refusing coverage of chiropractic services before 1981, and by offering only limited coverage of chiropractic services to groups that demanded it after 1981. Defendants argue, however, that they had an economic motive for refusing to provide chiropractic coverage, because they would have been forced to raise premium rates if such coverage was provided. *See* Levin Deposition, 157. This argument is belied by evidence in the record, in which Blue Cross assured physician members of the New Mexico Medical Society that premium rates for contracts not receiving chiropractic coverage would not be increased. Exhibit 27. Plaintiffs have produced evidence demonstrating that Blue Cross acted against its economic interests in refusing to provide chiropractic coverage, and in providing only limited chiropractic coverage beginning in 1981.

Plaintiffs have also demonstrated that defendants had a motive to enter into an agreement. *See Schoenkopf, supra.* The physician members of the New Mexico Medical Society were aware that Blue Cross required their participation or the endorsement of the Medical Society if Blue Cross was to retain its affiliation with the national Blue Cross & Blue Shield organization. Marshall deposition, 37. In 1981 only 60% of the physicians in New Mexico were participating physicians with Blue Cross. Levin Deposition, 33. Blue Cross would have suffered financially if its affiliation with national Blue Cross & Blue Shield had ceased. *Id.* at 177. In 1981, Blue Cross was concerned that if it provided chiropractic coverage it would lose many of its participating physicians, or that the physicians would take some action against Blue Cross. *Id.* at 174.

■ Furthermore, an inference of an agreement can be drawn from Blue Cross' repeated attempts to reassure the physician members of the New Mexico Medical Society that the limited coverage of chiropractic benefits when demanded would preserve Blue Cross' right to exclude chiropractic benefits from all of its policies. On June 4, 1981, Thomas Levin responded to Dr. Cronin's resignation from the Blue Cross Board of Directors by assuring Dr. Cronin that the decision to provide chiropractic coverage to groups that demanded it "will assist us in fighting the continuing efforts of the Corporation Commission to force us to include chiropractic coverage in all Blue Cross & Blue Shield contracts. We will not market chiropractic coverage or encourage its selection by any group of subscribers or individual subscribers." Exhibit 26. Mr. Levin concluded by assuring Dr. Cronin that "we will continue to fight the battle." *Id.* At the June 20, 1981 meeting of the Blue Cross Board of Directors, the Board unanimously voted to send an information letter to all physicians in New Mexico outlining the coverage of chiropractic services, "as compared with the coverage offered by Blue Cross & Blue Shield for coverage of physician services." Exhibit 29. In Thomas Levin's July 15, 1981 letter to Dr. John Smoker in which Blue Cross' history of attempts to forestall the inclusion of chiropractic benefits were outlined, Mr. Levin stated that he was convinced "that the action our Board has taken will do more to preserve our right to exclude chiropractic coverage than any action we could have taken." Exhibit 14. These sentiments were reiterated by Mr. Levin during his comments to the New Mexico

Medical Society Council meeting on August 1, 1981. Exhibit 31. Finally, on August 20, 1981, Mr. Levin wrote to Dr. Vaun Floyd, again expressing his conviction that the Board of Director's action in approving limited chiropractic coverage on demand would preserve the right to limit chiropractic coverage in the remainder of Blue Cross' contracts. Mr. Levin assured Dr. Floyd that even under the new policies, physicians would be reimbursed at higher rates than would the chiropractors. Exhibit 36.

These communications are sufficient to allow a jury to infer an agreement between Blue Cross and the physician members of the New Mexico Medical Society to deny chiropractic coverage. A jury might find that Blue Cross was concerned that its decision to provide such coverage would be construed as a breach of its agreement, necessitating frequent communications between the organization and the physicians in order to reassure the physicians that Blue Cross was still opposed to coverage of chiropractic services in all of its contracts. Plaintiffs have produced evidence showing a genuine issue of material fact as to the existence of a conspiracy among the defendants. Defendants' motion for summary judgment on that basis will, therefore, be denied.

Defendants also urge this court to grant their motion for summary judgment on the basis that their conduct did not result in a restraint of trade. Plaintiffs allege that defendants participated in a group boycott, in violation of the Sherman Act. Defendants do not dispute that Blue Cross did not offer to its subscribers the option of coverage for chiropractic services until 1981, and did so at that time only on a limited basis. This activity unquestionably restrained trade, in the sense that any decision to offer one product rather than another restrains trade. *See Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). The question is not, therefore, whether the challenged conduct restrained trade, but whether it constituted an *unreasonable* restraint of trade. *Northwest Wholesale Stationers, Inc. v. Pacific Stationery &*

*Printing Co.*, 472 U.S. 284, 288, 105 S.Ct. 2613, 2616, 86 L.Ed.2d 202 (1985).

The resolution of the question whether particular conduct constituted an unreasonable restraint of trade is normally accomplished by analysis under the "rule of reason." The rule of reason "requires the factfinder to determine whether, under all of the circumstances of the case, including the facts peculiar to the business and the history of, reasons for, and market impact of the restraint, the restrictive practice imposes an unreasonable restraint on competition." *Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.*, 675 F.2d 502, 504 (2d Cir.1982). Analysis under the rule of reason, in other words, requires weighing all the relevant circumstances of the case. *Monsanto Co. v. Spray–Rite Service Corp., supra*, 465 U.S. at 761, 104 S.Ct. at 1469. In a narrow category of cases, however, the court will not inquire into all the circumstances surrounding the restrictive practice and will, instead, presume that the conduct was unreasonable. This category of conduct is *per se* unreasonable and includes "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Plaintiffs argue that defendants' conduct in this case falls within the narrow category of restrictive practices to which *per se* analysis applies. They argue that this is a group boycott case, and that defendants have offered no competitive justification for their restrictive practices. Plaintiffs' argument lacks merit. Although the Supreme Court has included group boycotts in the category of practices labelled unlawful *per se*, it recently explicitly retreated from that position in *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). In that case, the Court

explained that the "category of restraints classed as group boycotts is not to be expanded indiscriminately[.]" *Id.* at ——, 106 S.Ct. at 2018. *See also Northwest Wholesale Stationers, supra.* Although the *Dentists* case, like the present case, involved a concerted refusal to deal on particular terms with patients covered by group health insurance, the Court analyzed the restraint under the rule of reason. The Court explained its reluctance to "condemn rules adopted by professional associations as unreasonable *per se* [citation omitted], and, in general, to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious[.]" *Indiana Federation of Dentists, supra.* Although a group boycott will not escape *per se* analysis merely because it was entered into by professionals, the professional group boycott is less amenable to *per se* analysis, and, conversely, more appropriately analyzed under the rule of reason, because of the presence of ethical considerations binding physicians.

■ In this case, as in *Wilk v. American Medical Association,* 719 F.2d 207 (7th Cir. 1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2399, 81 L.Ed.2d 355 (1984) (chiropractors sued physicians' association and physicians for refusal to deal professionally), the American Medical Association had in effect Principle of Medical Ethics # 3, which prohibited physicians from associating professionally with anyone who practiced methods of healing "not founded on a scientific basis." Exhibit 6. There is evidence in the record that the defendant physicians were concerned that their participation in Blue Cross might violate Principle of Medical Ethics # 3 if Blue Cross provided coverage for chiropractic services. Exhibits 1, 11, 27. As the court pointed out in *Wilk,* "a canon of medical ethics purporting, surely not frivolously, to address the importance of scientific method gives rise to questions of sufficient delicacy and novelty at least to escape *per se* treatment." *Wilk, supra,* at 222.

■ Furthermore, the group boycott alleged in this case is not the classic group boycott to which the *per se* approach has been applied. Although the relationship between the chiropractors and the physician defendants might be characterized as a horizontal relationship between competitors, Blue Cross is a competitor of neither the physicians nor the chiropractors. Instead, Blue Cross deals with physicians in a vertical relationship not unlike the distributor/supplier relationship at issue in *Westman Commission Company v. Hobart International, Inc.,* 796 F.2d 1216 (10th Cir. 1986). In that case, the Tenth Circuit agreed with the Seventh Circuit Court of Appeals that " 'in the absence of any evidence of intent to raise prices ... an agreement whereby a supplier of some goods or service refuses, at the behest of one of his distributors, to deal with a competitor of that distributor is not illegal per se.' " *Id.* at 1223 (quoting *Products Liability Insurance Agency, Inc. v. Crum & Forster Insurance Cos.,* 682 F.2d 660, 663 (7th Cir. 1982)). In this case, plaintiff does not allege that the physician defendants' alleged collusion with Blue Cross to deny coverage to chiropractors was motivated by an intent to raise prices. Although concerted action to raise prices may be *per se* illegal, concerted action on nonprice restrictions is judged under the rule of reason. *Monsanto v. Spray–Rite, supra,* 465 U.S. at 761, 104 S.Ct. at 1469.

■ Plaintiffs argue that Blue Cross has offered no competitive justification for its refusal to include chiropractic coverage in its health care cost reimbursement packages, and that the absence of such justification makes the practice *per se* illegal. This argument is not well-taken. Thomas Levin, president of Blue Cross, testified that coverage of chiropractic services would have necessitated an increase in the cost of Blue Cross coverage to consumers, Levin Deposition, 157. Other health care insurance providers included chiropractic coverage in their reimbursement packages. Exhibit 14. Blue Cross argues that its decision to keep costs to consumers down by offering a health care package without coverage of chiropractic services was, in fact, a procompetitive decision, because it

offered consumers a choice between health care cost reimbursement packages. Without addressing the merits of this argument, this is a sufficient competitive justification for Blue Cross' refusal to include chiropractic coverage to warrant consideration on the merits under the rule of reason.

■ Finally, the restrictive practice of which plaintiffs complain is, at most, an indirect restraint of trade. Plaintiffs do not allege that defendants' conduct interfered directly with plaintiffs' access to consumers, or that they were unable to practice their profession because of defendants' activities. Although Blue Cross coverage may be valuable to chiropractors in competing with physicians for patients, the refusal to provide such coverage does not totally exclude chiropractors from the patient market. Like orthopaedists in *Marrese v. American Academy of Orthopaedic Surgeons*, 706 F.2d 1488, 1495–96 (7th Cir. 1983), *rev'd on other grounds*, 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985), the plaintiff chiropractors' ability to attract patients is only indirectly affected by the refusal of Blue Cross to cover chiropractic services. Such an indirect restraint is properly analyzed under the rule of reason.

Defendants urge that summary judgment should be granted, because Blue Cross does not possess market power, which is an essential component of the inquiry under the rule of reason. "[S]ection one of the Sherman Act does not proscribe refusals to deal absent a showing of monopoly or market power[.]" *Westman Commission Company v. Hobart International, Inc., supra*, at 1229. Market power is traditionally defined as "the ability to raise prices above those that would be charged in a competitive market." *National Collegiate Athletic Association v. Board of Regents of the University of Oklahoma*, 468 U.S. 85, 109 n. 38, 104 S.Ct. 2948, 2964 n. 38, 82 L.Ed.2d 70 (1984). The purpose of the inquiry into market power is to determine whether a particular business arrangement has the potential for actual adverse effects on competition, which may not always be readily measured. *Federal Trade Commission v. Indiana Federation of Dentists, supra*, 476 U.S. at 460–61, 106 S.Ct. at 2018–19.

■ Defendants argue that Blue Cross lacks market power, because its market share was, as a matter of law, too low to indicate a potential for adverse effects on competition. Market share is one way of ascertaining market power. *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1335 (7th Cir.1986). In 1978, Blue Cross earned 26.8% of the total premiums written by commercial carriers doing business in the health care field in New Mexico. Kidd Affidavit, ¶ 4. In 1980, Blue Cross possessed a 29.5% market share. *Id.* at ¶ 5. In 1982, Blue Cross earned 31.6% of the total premiums sold in New Mexico. *Id.* at ¶ 6. These statistics are not, however, determinative of Blue Cross' possession of market power. Plaintiffs' expert notes that because of the non-profit status of Blue Cross,[1] administrators and physicians controlling the Board of Directors have incentive to limit Blue Cross' market share by keeping the levels of reimbursements to physicians and administrative costs high, thereby artificially depressing Blue Cross' market share. Sass Affidavit, ¶ 9. *See also Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 232 n. 39, 99 S.Ct. 1067, 1083 n. 39, 59 L.Ed.2d 261 (1979).

■ Defendants argue that another factor in the determination of lack of market power is a low barrier to entry in the health insurance field. Plaintiffs' expert concedes that the cost of entering the New Mexico health insurance market are relatively low, but also points out that none of the 116 insurance companies who have entered the market during the past ten years have been able to capture even a one percent market share. Sass Affidavit, ¶ 7. In 1985, the only year for which such data was submitted, Blue Cross' nearest competitor possessed less than half of Blue Cross'

---

1. Blue Cross is the only non-profit provider of health care insurance in New Mexico, Sass Affi- davit, ¶ 10, and gains tax advantages because of that status. *Id.*

market share. *Id.*, Appendix I.[2] Defendants do not contest plaintiffs' statistics. These statistics suggest that Blue Cross' 25 to 30% share of the market may, in fact, reflect market power. When that market share is considered, as well as the market share of Blue Cross' nearest competitor, and the inability of entering companies to capture any significant portion of the market in health care insurance, it is apparent that a genuine issue of material fact exists as to whether Blue Cross possesses market power in the health care insurance field. Defendants' motion for summary judgment on the basis of Blue Cross' lack of market power will, therefore, be denied.

Now, Therefore,

IT IS BY THE COURT ORDERED that defendants' motion for summary judgment is denied.

---

2. Blue Cross possessed a 26.2% market share. Equitable Life Assurance possessed a 12.1% market share. The next highest competitor within the market was Lovelace Health Plan, with 7.7% of the market. Sass Affidavit, Appendix I.