**EMPIRE STATE PHARMACEUTICAL SOCIETY, INC., Plaintiff,**

v.

**EMPIRE BLUE CROSS AND BLUE SHIELD OF GREATER NEW YORK, also known as Blue Cross and Blue Shield of Greater New York, Erwin L. Werner, John F. Muldoon, Robert F. McGrath, Jonathan F. Haley, Preston Jordan, Sterling E. Cathey and Leslie Strassberg, Defendants.**

No. 86 Civ. 3889 (JES).

United States District Court, S.D. New York.

Nov. 12, 1991.

Rosenbaum Wise Lerman & Katz, New York City (Elliott L. Katz, Lisa M. Gioia, Jerome I. Sager, of counsel), for plaintiff.

Breed, Abbott & Morgan, New York City (James J. Sabella, Jill I. Braverman, of counsel), for defendants.

## OPINION AND ORDER

SPRIZZO, District Judge:

Plaintiff Empire State Pharmaceutical Society, Inc. ("Empire State") brings this action against Empire Blue Cross and Blue Shield ("Blue Cross"), and certain of its officers, directors, and employees (the "individual defendants") for violations of the antitrust laws because Blue Cross charged plaintiff a higher rate for major medical insurance coverage for its members than that charged to one of its competitors, Long Island Pharmaceutical Company ("Long Island"). Plaintiff's amended complaint alleges that Blue Cross violated the Robinson–Patman Act, 15 U.S.C. § 13 (1988), and engaged in a combination and conspiracy in restraint of interstate commerce in violation of the Clayton Act, 15 U.S.C. § 12 (1988), and the Sherman Act, 15 U.S.C. § 1 (1988).

On September 25, 1987, after hearing Oral Argument, the Court dismissed the Robinson–Patman and Clayton Act claims,[1] but concluded that plaintiff's complaint adequately alleged a conspiracy in violation of the Sherman Act. See 15 U.S.C. § 1 (1988). Upon completion of discovery, all defendants moved for summary judgment on the Sherman Act claims, and for sanctions. On January 12, 1990, after hearing Oral Argument, the Court granted the defendants' motion for summary judgment, but ordered additional briefing and argument on the question of whether sanctions should be imposed pursuant to Fed.R.Civ.P. 11. For the reasons that follow, the Court concludes that Rule 11 sanctions are appropriate.

## BACKGROUND

Empire State is a professional society of pharmacies, whose membership is comprised of pharmacies located throughout New York state.[2] It offers its members a variety of services and benefits, including major medical and hospitalization insurance coverage. Defendant Blue Cross is a not-for-profit health service organization orga-

---

1. The Court found that the anti-discrimination provisions of the Robinson–Patman Act had no applicability to the purchase and sale of insurance. The Clayton Act claims were dismissed because there were no allegations that the defendant's conduct was designed to perpetuate or obtain monopoly power.

2. According to plaintiff's estimates, the number of its members was 750 in 1984, 1,000 in 1986, and 1,200 in 1987. See Deposition of Sandra Wagner ("Wagner Dep.") at 143; see also Defendants' Rule 3(g) Statement of Material Facts in Support of Motion for Summary Judgment ("Defendants' Rule 3(g) Statement") at ¶ 33.

nized under Article 43 of the New York Insurance Law. Blue Cross provides insurance coverage for hospitalization and health-related services for several million covered persons in a 28 county area in the state of New York, including the New York metropolitan area. The individual defendants are former or present officers, directors, or employees of Blue Cross. Long Island, which is not a party to this action, is also a professional society of pharmacies in New York state and offers services and benefits to its members similar to those offered by Empire State, including major medical and hospitalization insurance. It competes with Empire State for members.[3] *See* Wagner Dep. at ¶ 5; Letter of Jerome Sager to Erwin L. Werner, December 26, 1985.

Empire State purchased group major medical health insurance coverage from Blue Cross in December, 1984, which became effective January 1, 1985.[4] At that time, insurance premiums for group major medical insurance were set based upon one of two possible classifications: "experience-rated" or "community-rated." Experience-rated groups paid premiums based upon the cost of coverage to the individual members of the group, *see* Deposition of Ronald D. Zammit ("Zammit Dep.") at 6; Defendants' Rule 3(g) Statement at ¶ 5, whereas the community-rated groups premiums were calculated based upon the costs of providing coverage to the community as a whole. *See* Defendants' Rule 3(g) Statement at ¶ 5. It is undisputed that the community-rated premiums were significantly less expensive than experience-rated premiums. *See, e.g.,* Plaintiff's Complaint at ¶ 11(c); Plaintiff's Amended Complaint at ¶ 11(c); Letter of Jerome Sager to Erwin L. Werner (October 2, 1984); Letter of Jerome Sager to Erwin L. Werner (December 26, 1985); Wagner Dep. at ¶ 5.

During the years from 1978 to 1986, underwriting guidelines for purchases of group major medical coverage provided that if a group contained less than 100 subscribers, community-rated premiums were charged whereas experience-rated premiums were charged to groups with 100 or more subscribers. *See* Deposition of Harry Nicholsen ("Nicholsen Dep.") at 33; Zammit Dep. at 61; Deposition of Adrienne Rosenbluth ("Rosenbluth Dep.") at 14. Moreover, subdividing experience-rated groups into smaller groups for the sole purpose of avoiding the unfavorable experience-rating and qualifying for the community-rating was prohibited both by Blue Cross' underwriting regulations, *see* Blue Cross Blue Shield Underwriting Manual ¶ 1.6 at 25; Zammit Dep. at 67, and New York state law. *See* 11 N.Y.C.R.R. § 52.-40(c)(2)(vii) (1984); *See also* Deposition of Leslie Strassberg ("Strassberg Dep.") at 75.

Therefore, when Empire State applied for group major medical insurance its representatives were told that since it was applying on behalf of a group consisting of more than 100 members the premium would be based on the experience-rating method, *see* Fisher Aff. at ¶ 4; Wagner Aff. at ¶ 4; Sager Dep. at 126, and that Empire State could not meet the requirements for a community-rating by grouping its members in smaller segments. *See* Wagner Aff. ¶ 5; Affidavit of Harry Nicholsen ("Nicholsen Aff.") at ¶ 3; Sager Dep. at 153; Strassberg Dep. at 81. Empire State objected to paying the higher rate because it claimed that its rival, Long Island, was accorded community-rating for similar coverage. *See* Wagner Aff. at ¶ 5; Sager Dep. at 127, 140, 152; Nicholsen Dep. at 50. Nevertheless, Empire State entered into major medical insurance cover-

---

**3.** The estimated membership for Long Island during 1984–86 grew from about 260 to about 300 members. *See* Deposition of Ray Blank ("Blank Dep.") at 10; Defendants' Rule 3(g) Statement at ¶ 34.

**4.** Empire State began its affiliation with Blue Cross in 1978, when it purchased a group hospitalization policy for its members. *See* Plaintiff's Rule 3(g) Statement of Material Facts in Opposi-

tion to Motion for Summary Judgment ("Plaintiff's Rule 3(g) Statement") at ¶ 2. In the late summer of 1984, Empire State contacted Blue Cross about purchasing a major medical insurance policy for its members. *See* Deposition of Jerome Sager ("Sager Dep.") at 122, 125; Affidavit of Sandra Wagner ("Wagner Aff.") at ¶ 3; Affidavit of Al Fisher ("Fisher Aff.") at ¶ 3.

age with Blue Cross for the years 1985, 1986, and 1987. *See* Sager Dep. at 121.

The evidence indicates that Long Island received its community-rating in the following manner. Individual pharmacies or groups of pharmacies who were members of Long Island had begun contacting Blue Cross by telephone in 1978 to secure major medical coverage, well before Empire State sought similar coverage. *See* Rosenbluth Dep. at 30–33, 36–38, 77, 82; Zammit Dep. at 45–57, 61–62, 65–66, 70–71, 77; Strassberg Dep. at 58, 64; Affidavit of Lucy McCarthy ("McCarthy Aff.") at ¶¶ 2, 4; *see also* Affidavit of James J. Sabella, Esq. ("Sabella Aff.") at Exhibit 12. These telephone enrollments were followed by the later submission of completed enrollment forms by each group. *See* McCarthy Aff. at ¶ 2. Since these individual or groups of pharmacies consisted of fewer than 100 members, they were given a community-rating.[5] *See* Rosenbluth Dep. at 30–33, 36–38, 77, 82; Zammit Dep. at 27–28, 35–39, 45–46, 61–62, 65; Nicholsen Dep. at 32–34, 64–65, 88; Strassberg Dep. at 58, 64.

Ultimately, twenty-nine separate groups of Long Island-member pharmacies, each comprised of less than 100 members, applied for and received major medical coverage from Blue Cross. Although the total number in these twenty-nine groups exceeded 100 members, *see* Rosenbluth Dep. at 83; Nicholsen Dep. at 58, these groups were treated as separate entities even though all had the same group administrator and the same billing address. *See* Strassberg Dep. at 69, 79; Nicholsen Dep. at 51; Sager Dep. at 128; Exhibit 12. However, the evidence established that at the time of their enrollment Blue Cross did not know of an affiliation among the groups, and that Blue Cross did not inquire into any possible affiliation among the groups. *See* Affidavit of Ronald D. Zammit ("Zammit Aff.") at ¶¶ 3, 4; McCarthy Aff. at ¶¶ 2, 4; Defendant's Rule 3(g) Statement at ¶ 17. There was some evidence, however, that at a later time Blue Cross became aware of further information bearing upon Long Island's eligibility for the community rating.[6]

When Empire State was refused the community-rating, it registered repeated complaints with representatives of Blue Cross concerning the disparity of treatment between itself and Long Island, *see* Nicholsen Dep. at 45, 50, 60; Deposition of Jonathan Haley ("Haley Dep.") at 33, and sent letters of complaint to Erwin L. Werner, Chairman of the Board of Blue Cross (Exhibits L, M). Empire State also complained to the New York State Insurance Department alleging, *inter alia*, that Blue Cross engaged in a "discriminatory practice" when it refused to apply to Empire State the same type of rate used for Long Island. *See* Exhibits 14, 16. However, after considering Blue Cross' responses to these allegations, the New York State Insurance Department took no action on the matter.

These complaints, however, generated an internal investigation at Blue Cross, *see*

---

5. Defendants do not concede that the rate it applied to Long Island was incorrect and has reserved its right to argue at trial that the rate applied can be justified under its guidelines. *See* Defendants' Reply Memorandum in Support of Motion for Summary Judgment at 9 n. 5; *see also* Zammit Dep. at 54–57, 65–67. However, taking the facts in the light most favorable to the plaintiff, the Court will assume *arguendo* that the rate applied to Long Island was erroneous.

6. Plaintiff has submitted affidavits that assert that at a meeting in late 1984, representatives of Empire State told representatives of Blue Cross that Long Island had segmented into 29 groups to obtain community rated medical coverage and that one representative of Blue Cross, Mr. Harry Nicholsen, stated that he knew that Long Island had done so. *See* Wagner Aff. at ¶¶ 5–6;

Al Fisher Aff. at 4. Mr. Nicholsen testified at his deposition, however, that when he was informed of Long Island's situation he stated only that he would investigate it. *See* Nicholsen Dep. at 44–45, 61, 65. This conflicting evidence, even when viewed in the light most favorable to the plaintiff, establishes only that Nicholsen may have known prior to late 1984 that Long Island was improperly receiving a lower rate. It is hardly sufficient to establish a conspiracy between Long Island and Blue Cross. Moreover, the circumstance that Nicholsen may have been Long Island's representative for a short time in the early 1970's, *see* Nicholsen Dep. at 44, is in itself insufficient to support an inference that he participated in a conspiracy because at all times relevant to this action he had no contact with Long Island. *See* Nicholsen Aff. at ¶¶ 4–5.

Nicholsen Dep. at 54, 60; Rosenbluth Dep. at 39ff, which resulted in the formation of a single division to administer all aspects of association groups so as to prevent non-qualifying groups from being offered the benefits of the community rating. *See* Affidavit of Adrienne Rosenbluth ("Rosenbluth Aff.") at ¶ 3; Zammit Aff. at ¶ 2. As a consequence, as of January 1987, Long Island and Empire State were put on the same rating basis. *See* Wagner Aff. at ¶ 6; Affidavit of Leslie Strassberg ("Strassberg Aff.") at ¶ 4.

## DISCUSSION

The aforesaid facts have been recited in some detail so that the application of Rule 11 sanctions may be placed in proper perspective. These facts demonstrate that even after being offered the benefit of full discovery, plaintiff was not able to elicit any facts which support a plausible inference that the difference in rates charged Empire State and Long Island was the result of a conspiracy between Long Island and Blue Cross to restrain trade, or injure competition, or indeed to deprive Empire State of the ability to compete with its rivals. Certainly neither Blue Cross nor its employees had any economic incentive to favor Long Island over Empire State, and there is not a scintilla of evidence that Blue

Cross could benefit in any way from doing so.

Nor is there any evidence to support a rational inference that there was any conspiratorial or collusive or concerted action between Blue Cross and Long Island which resulted in Long Island being charged a lower rate than it should have been charged.[7] Indeed, the uncontradicted evidence established that Long Island obtained this rate long before Empire State sought similar coverage, and there is no evidence to support a finding that Blue Cross was aware at that time that a higher rate should have been charged. In sum, there is no proof that the discrimination resulted from anything other than honest error.

In any event, even assuming *arguendo* some of Blue Cross' employees knew that a higher rate should have been charged and endeavored to assist Long Island in obtaining and concealing the lower rate, given the economic incentive that these employees had as a consequence of bonus arrangements based upon sales performance, no rational inference could be drawn that they acted for conspiratorial rather than individual motivations.[8] This is especially true since Blue Cross subsequently changed the rate charged to Long Island to the correct premium rate, which in itself negates any inference of conspiracy.[9]

**7.** Defendants have submitted affidavits from all of the relevant Blue Cross personnel which flatly deny the existence of any illicit conspiracy, *see, e.g.,* Affidavit of Jonathan F. Haley ("Haley Aff.") at ¶ 4; Affidavit of John F. Muldoon ("Muldoon Aff.") at ¶ 5; Nicholsen Aff. at ¶ 5; Strassberg Aff. at ¶ 5; Rosenbluth at ¶ 4; Zammit Aff. at ¶ 4, and the plaintiff has failed to point to any evidence in the record which contradicts this testimony.

**8.** These acts, even if they could be properly imputed to Blue Cross might, since they were in derogation of Blue Cross' economic interest, arguably support an inference of conspiratorial as opposed to unilateral action. However, they would still be plainly insufficient to support the Sherman Act claims because those claims would still lack economic plausibility.

**9.** As further support for the argument that no conspiracy to drive Empire State out of business existed, defendants have submitted evidence establishing that Blue Cross negotiated and worked with Empire State in order to address

problems Empire State was having in securing the requisite number of applicants for the major medical plan. According to Blue Cross' underwriting guidelines, a minimum of 75% of Empire State's members would have to apply for the major medical coverage before it could be issued. However, this requirement was modified in plaintiff's favor to require only that a minimum of 300 applications be received from among plaintiff's membership. *See* Sager Dep. at 132; Wagner Dep. at 102; Exhibit 10; Exhibit 11; Letter of Jerome Sager to Erwin L. Werner, December 26, 1985; Defendant's Rule 3(g) Statement. In view of this evidence of accommodations to Empire State, the assertion of a conspiracy to drive Empire State out of business borders on the frivolous.

Plaintiff attempts to further bolster its claim of a conspiracy between Blue Cross and Long Island to drive it out of business by pointing to two facts: 1) Blue Cross froze Empire State's hospitalization insurance group to prevent further enrollment; and, 2) Medicare-eligible members of Empire State were made ineligible for

Fed.R.Civ.P. 11 requires that all pleadings, motions or other papers be signed by an attorney or a party. That signature certifies to the Court that the signer has read the document, and has conducted a reasonable inquiry into the facts and law and is satisfied that the document is well-grounded in both, and is not acting for any improper motive. *See Business Guides, Inc. v. Chromatic Comm. Ent., Inc.,* —— U.S. ——, 111 S.Ct. 922, 929, 112 L.Ed.2d 1140 (1991); *O'Malley v. New York City Transit Authority,* 896 F.2d 704, 706 (2d Cir.1989) (quoting *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 253 (2d Cir.1985), *cert. denied,* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987)). Moreover, the Rule mandates sanctions where it is clear that a reasonable inquiry into the basis for the pleading has not been made, or there is no chance of success under existing law, or no reasonable argument has been advanced to extend, modify, or reverse the existing law. *See Int'l Shipping Co. v. Hydra Offshore, Inc.,* 875 F.2d 388, 390 (2d Cir.), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989). In making this determination, the Court must focus not upon the signer's subjective good faith belief, but rather upon whether his conduct was objectively reasonable under the circumstances. *Business Guides,* 111 S.Ct. at 933; *see also McMahon v. Shearson/American Express, Inc.,* 896 F.2d 17, 22 (2d Cir.1990) (quoting *Greenberg v. Hilton Int'l Co.,* 870 F.2d 926, 934 (2d Cir. 1989)).

Defendants argue that notwithstanding plaintiff's assertions that it hired a legal research firm and that its General Counsel interviewed witnesses, its two principal contentions from the outset of the litigation, the Robinson–Patman claim and the Sherman Act conspiracy, are so devoid of merit that no reasonable attorney could have thought them colorable. The Court agrees.

Defendants have cited to the Court an abundance of authority establishing that the Robinson–Patman Act applies only to goods and commodities and does not apply to services such as insurance. *See Freeman v. Chicago Title and Trust Co.,* 505 F.2d 527 (7th Cir.1974) (insurance); *see, e.g., Ambook Enter. v. Time Inc.,* 612 F.2d 604, 609–10 (2d Cir.1979), *cert. dismissed,* 448 U.S. 914, 101 S.Ct. 35, 65 L.Ed.2d 1179 (1980) (newspaper advertising); *Gordon v. New York Stock Exchange, Inc.,* 498 F.2d 1303, 1305 n. 7 (2d Cir.1974), *aff'd* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975) (brokerage services); *Rodman v. Haines,* 1976–2 Trade Cas. (CCH) ¶ 61,074, at 69,841–42, 1976 WL 1315 (S.D.N.Y.1976) (lease of real property); *SCM Corp. v. Xerox Corp.,* 394 F.Supp. 384, 385–86 (D.Conn.1975) (photocopying services). Moreover, the legislative history and the great preponderance of scholarly authority also compel that conclusion. *See, e.g.,* 91 Cong.Rec. 1090 (1945) (statement of Rep. Gwynne) ("The Robinson–Patman Act was passed with the intent that it should regulate and control the sale of commodities."); 79 Cong.Rec. 9078 (June 11, 1935) (statement of Rep. Patman) ("[The Act] prohibits generally price discrimination between purchasers of goods of like grade and quality."); American Bar Association, *Antitrust Law Developments (Second)* 226 n. 63 (1984); 2 Harry A. Toulmin, Jr., *Toulmin's Antitrust Laws of the United States* § 7.2 (1949 & Supp.1980); Wright Patman, *Complete Guide to the Robinson–Patman Act* 33 (1963); *see generally,* Lawrence A. Sullivan, *Handbook of the Law of Antitrust* 680 (1977); Frederick M. Rowe, *Price Discrimination Under the Robinson–Patman Act* 59–62 (1962). Plaintiff has not cited a single case to support its claim that there was a colorable basis to believe that the facts alleged supported a Robinson–

---

major medical coverage. However, these facts do not rationally support plaintiff's Sherman Act claims because as defendants correctly assert, they were of benefit to, rather than damaging to plaintiff. Plaintiff has not refuted this assertion. Freezing Empire State's hospitalization group enrollment assisted Empire State

in meeting minimum enrollment requirements for major medical coverage, and rendering Medicare-eligible members ineligible for major medical coverage maintained a more favorable experience rating for Empire State by excluding the poor claims history that medicare-eligible members were more likely to have.

Patman claim, despite being offered several opportunities to do so. The Court must therefore conclude that the assertion of a claim under the Robinson–Patman Act was objectively unreasonable.

Plaintiff's conspiracy claims are similarly unfounded. As plaintiff's affidavits in opposition to the motion for sanctions demonstrate, at the time it filed its complaint, plaintiff had only two facts in its possession which were even conceivably relevant to any alleged conspiracy: (1) the circumstance that Long Island was paying a lower premium rate than plaintiff; and (2) that Mr. Harry Nicholsen admitted to plaintiff's employees, including its General Counsel, that Blue Cross was aware that Long Island was receiving that lower rate and that some Blue Cross personnel had told Long Island how to obtain and conceal that lower rate. *See* Affidavit of Jerome I. Sager, Esq. at ¶¶ 7–8. However, as the discussion above makes clear, these facts do not come close to supporting any economically plausible basis for a Sherman Act claim. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 593–95, 106 S.Ct. 1348, 1356, 1359–60, 89 L.Ed.2d 538 (1986); *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987); *see also Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 762–64, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984); *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 278–80, 88 S.Ct. 1575, 1587–88, 20 L.Ed.2d 569 (1968); The Court must therefore also conclude that no reasonable attorney could have believed that a Sherman Act conspiracy could be established on the facts alleged, especially since the amended complaint was filed a full year [10] after the Supreme Court had clearly indicated in *Matsushita* that Sherman Act claims must be economically plausible.[11]

Indeed, the Second Circuit's decision in *Eastway* may well compel sanctions here. While there are some factual differences between this case and *Eastway*, especially in that there is here alleged a conspiracy with a competitor of plaintiff, which was not the case in *Eastway*, that case also involved a situation where the defendants had nothing to gain from an antitrust conspiracy and the plaintiff had failed to demonstrate how the defendants' activities had injured it. *See* 762 F.2d at 251. Moreover, as noted above, this complaint was filed after *Matsushita* made it clear that Sherman Act conspiracies cannot lack economic plausibility.

Having concluded that Rule 11 sanctions are appropriate, the Court must next consider upon whom they should be imposed. *See O'Malley, supra*, 896 F.2d at 709. The Supreme Court has recently held that where a represented party appends its signature to a document that a reasonable inquiry would have revealed to be without merit, a district court may sanction that party in addition to, or instead of, the attorney if the court concludes that the party's behavior was objectively unreasonable under the circumstances. *Business Guides,*

---

**10.** The Supreme Court decided *Matsushita* on March 26, 1986, almost two months before the original complaint was filed in this action, May 16, 1986, and a full year before the amended complaint, which is the paper relevant to this motion, was filed on May 27, 1987.

**11.** Plaintiff's reliance upon *Johnson v. Blue Cross/Blue Shield of New Mexico*, 677 F.Supp. 1112 (D.N.M.1987), is misplaced. In that case, plaintiffs, a group of licensed chiropractors, sued Blue Cross of New Mexico ("BCNM"), the New Mexico Medical Society ("NMMS"), and individual directors of each who were physicians, alleging a conspiracy to deny insurance coverage for chiropractic services. The district court denied defendants' summary judgment motion because the evidence of communications between the defendants indicated that BCNM agreed to forgo the new business that providing coverage for chiropractic services would have created in exchange for continued affiliation with and endorsement by the NMMS and its individual doctors. Although it was against BCNM's economic self-interest to do so, plaintiff demonstrated economic plausibility because BCNM's continued affiliation with the national Blue Cross organization required that BCNM be endorsed by the NMMS and the evidence demonstrated that the NMMS would withdraw its endorsement unless BCNM would refuse to provide insurance for chiropractic services. *See id.* at 1116. In the present case, in contrast, there has been no showing of an economically plausible reason for not charging a higher rate to both Empire State and Long Island.

*supra*, 111 S.Ct. at 932–33. The Court in *Business Guides* explained that "what is objectively reasonable for a client may differ from what is objectively reasonable for an attorney." *Id.* 111 S.Ct. at 933 (quoting lower court opinion).

In this case, plaintiff's General Counsel, who was also the Executive Director of Empire State, was the attorney who signed the amended complaint in violation of Rule 11. Moreover, he was involved in the negotiations between Blue Cross and Empire State in a business capacity and was also the author of a number of letters to Blue Cross officials complaining about the disparity in treatment between Empire State and Long Island. Given that the legal activity of the corporation's counsel is therefore virtually indistinguishable from the business activity of the client corporation, this case presents a situation where the client should be sanctioned as well as the attorney. Accordingly, the Court concludes that sanctions shall be imposed against Empire State Pharmaceutical Society, Inc. and Jerome I. Sager, Esq., jointly and severally.

Finally, the Court must determine the appropriate amount of sanctions. District courts have broad discretion in ascertaining the appropriate amount of a defendant's attorneys' fees though reasonable to serve the purpose of the rule, which is to deter baseless filings in the district courts, thereby streamlining administration and procedure of the federal courts. *See Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359 (1990); *O'Malley, supra*, 896 F.2d at 709; *Int'l Shipping*, 875 F.2d at 393; *Eastway Construction Corp. v. City of New York*, 821 F.2d 121, 123 (2d Cir.1987). Thus, the court must impose a sanction to sufficiently deter frivolous litigation without unduly or unfairly punishing the offender. *Eastway Construction Corp., supra*, 821 F.2d at 123. However, although defendant has submitted an affidavit asserting that its attorneys' fees were in excess of $150,000, the Court is not satisfied that that sum is a proper measure of what the sanction should be.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted and judgment shall be entered dismissing the complaint in its entirety with prejudice. The defendants' motion for Rule 11 sanctions is also granted and the Court will enter judgment ordering Jerome I. Sager, Esq. and Empire State Pharmaceutical Society, Inc. to pay those sanctions jointly and severally. Both parties shall submit letter briefs not to exceed five pages within 30 days of the date of this order addressing the appropriate amount of sanctions in light of the standards articulated above. All parties shall appear at a Pre–Trial Conference on January 10, 1992, at which time the Court will announce its decision relating to the amount of Rule 11 costs to be imposed.

It is SO ORDERED.